# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| GANNETT CO., INC., GRAY LOCAL MEDIA, INC., NASHVILLE PUBLIC MEDIA, INC. *d/b/a* NASHVILLE BANNER, NEXSTAR MEDIA GROUP, INC., SCRIPPS MEDIA, INC., STATES NEWSROOM *d/b/a* TENNESSEE LOOKOUT, and TEGNA INC., | CASE NO. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | |
| v. | |
| JEFF LONG, *in his official capacity as Commissioner of the Tennessee Department of Safety and Homeland Security*, GLENN FUNK, *in his official capacity as District Attorney General for Nashville & Davidson County, Tennessee*, and JOHN DRAKE, *in his official capacity as Chief of Metropolitan Nashville Police Department*, | |
| *Defendants*. | |

## INTRODUCTION

1.     "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials[,] and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

2.     That role is of particular importance in the context of law enforcement, where journalists "guard[] against the miscarriage of justice by subjecting the police" —

and the important public powers they exercise—"to extensive public scrutiny."

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

3.    On May 9, 2025, Tennessee enacted a statute, SB 30 ("the Act"), that

unconstitutionally abridges the press's ability to fulfill that function.

4.    In relevant part, Section 5 of the Act makes it a misdemeanor to

"intentionally approach[], within twenty-five feet (25'), a law enforcement officer after

the officer has ordered the person to stop approaching or to retreat and the officer is

lawfully engaged in the execution of official duties" in certain scenarios.

5.    The Act applies whenever an officer is engaged in "(1) A lawful traffic

stop; (2) An active investigation of the scene of an alleged crime; or (3) An ongoing and

immediate threat to public safety"—contexts broad enough to sweep in most of what

officers do in public, from enforcing the law at a public assembly to conducting disaster

response.  But unlike background Tennessee law, the Act does not require that an

individual in fact interfere—or intend to interfere—with an officer's execution of any of

those duties, *see* Tenn. Code Ann. § 39-16-602 (prohibiting obstruction of law

enforcement officer), or that their presence be "dangerous," *id.* § 39-17-305.

6.    The Act went into effect on July 1, 2025, and Section 5 will be codified at

Tenn. Code Ann., Title 39, Chapter 16, Part 6.

7.    The Act has grave implications for the ability of reporters and news

organizations, including Plaintiffs, to exercise their First Amendment rights.

8.      The Act grants officers standardless discretion to prevent journalists from approaching near enough to document the way officers perform their duties in public places.  In other words, it provides for "government by the moment-to-moment opinions of a policeman on his beat."  *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965) (quoting *Cox v. Louisiana*, 379 U.S. 536, 579 (1965) (Black, J., concurring)).

9.      The Act authorizes law enforcement officers to bar journalists (and the public) from reporting—for any reason or no reason—on a wide range of events of public interest, including a parade, a rally, an arrest, or an accident scene.

10.     The Act applies with equal force to a reporter gathering the news in a park, standing on a sidewalk, or lawfully present in other spaces open to the public.

11.     And the Act provides no exceptions for circumstances where 25 feet is too far—as it will often be too far—for the press or public to document newsworthy activity, including officers' own performance of their official responsibilities.

12.     The breadth and importance of the reporting that will be chilled if the Act goes into effect despite those infirmities are difficult to overstate.

13.     Reporters across Tennessee come into close contact with law enforcement officers on a routine basis, covering everything from crime scenes and protests to CMA Fest and University of Tennessee football games.  The Act, in those scenarios and more, empowers officers to force journalists and members of the public out of sight and earshot—and "[i]f police could stop criticism or filming by asking onlookers to leave,"

officers could "effectively silence them" and "bypass the Constitution." *Jordan v.*
*Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (citation omitted).

14.    Plaintiffs are Gannett Co., Inc.; Gray Local Media, Inc.; Nashville Public
Media, Inc. *d/b/a* Nashville Banner; Nexstar Media Group, Inc.; Scripps Media, Inc.;
States Newsroom *d/b/a* Tennessee Lookout; and TEGNA Inc.—organizations whose
journalists exercise the right to gather and publish the news in Tennessee.

15.    Plaintiffs bring this action to redress the constitutional harms the Act
threatens to inflict on their ability to gather and report news in Tennessee.

<u>JURISDICTION AND VENUE</u>

16.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant
to 28 U.S.C. §§ 1331 and 1343.

17.    Venue is proper in the Middle District of Tennessee under 28 U.S.C.
§ 1391(b) because Defendants reside in this District and because a substantial part of the
events or omissions giving rise to Plaintiffs' claims occurred in this District.

<u>PARTIES</u>

18.    Gannett Co., Inc. ("Gannett") is the largest local newspaper company in
the United States.  It has more than 200 local daily brands in 43 states.  In Tennessee,
Gannett owns and operates through its subsidiaries the *Tennessean* in Nashville, the
*Commercial Appeal* in Memphis, the *Knoxville News Sentinel* in Knoxville, the *Leaf-
Chronicle* in Clarksville, the *Daily Herald* in Columbia, the *Oak Ridger* in Oak Ridge, the

*Daily News Journal* in Murfreesboro, and the *Jackson Sun* in Jackson. These publications employ full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

19.     Gray Local Media, Inc. ("Gray") is a multimedia company headquartered in Atlanta, Georgia. The company is the nation's largest owner of top-rated local television stations and digital assets serving 113 television markets that collectively reach approximately 36 percent of US television households. Gray's presence in Tennessee includes television stations WSMV (Nashville), RTM Studios (Franklin), Action News (Memphis), and WVLT (Knoxville). Gray employs full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

20.     Nashville Public Media, Inc. is a non-profit newsroom in Nashville, doing business as the Nashville Banner ("Nashville Banner"). Nashville Banner employs full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

21.     Nexstar Media Group, Inc. ("Nexstar") is a leading diversified media company that leverages localism to bring new services and value to consumers and advertisers through its traditional media, digital, and mobile media platforms. In

Tennessee, Nexstar owns and operates WKRN in Nashville, WREG in Memphis, WJKT in Jackson, and WATE in Knoxville. Nexstar employs full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

22.     Scripps Media, Inc. ("Scripps") is the nation's fourth-largest local TV broadcaster, operating a portfolio of 61 stations in 41 markets. In Tennessee, Scripps owns and operates WTVF in Nashville. Scripps employs full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

23.     States Newsroom is a non-profit network of local newsrooms. In Tennessee, States Newsroom operates the Nashville-based Tennessee Lookout. Tennessee Lookout employs full-time reporters who gather news on matters of public concern on a routine daily basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

24.     TEGNA Inc. ("TEGNA") is a multimedia company headquartered in Tysons, Virginia, and owns or services (through shared service agreements or other similar agreements) 64 news brands in 51 markets. In Tennessee, TEGNA owns and operates WATN and WLMT in Memphis, and WBIR in Knoxville. TEGNA employs full-time reporters who gather news on matters of public concern on a routine daily

basis, including news about law enforcement gathered through the use of audiovisual recording equipment.

25.     Defendant Jeff Long is the Commissioner of the Tennessee Department of Safety and Homeland Security.  Under Tennessee law, he oversees the Division of Protective Services, which provides "police services by sworn officers for the State Capitol, the Legislative Plaza, the War Memorial Building and all state office buildings, and to provide personal security from time to time of state officials."  Tenn. Code Ann. § 4-3-2006(a)(2).  Under Defendant Long's direction and control, state facility protection officers are authorized to "make arrests for public offenses committed against state officials or employees or committed upon, about, or against property owned or leased by the state or on public roads or rights-of-way passing through such owned or leased property."  *Id.* § 4-3-2019(c).  Under Long, the Tennessee Department of Safety and Homeland Security likewise houses the Tennessee Highway Patrol.  *See id.* § 4-3-2003. Defendant Long is sued in his official capacity.

26.     Defendant Glenn Funk is the District Attorney General for Metropolitan Nashville and Davidson County, Tennessee.  Under Tennessee law, he is empowered to "prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto."  Tenn. Code Ann. § 8-7-103(1). Defendant Funk is sued in his official capacity.

27.     Defendant John Drake is the Chief of the Metropolitan Nashville Police

Department.  The Metropolitan Nashville Police Department, under his supervision and

control, is responsible "for the preservation of the public peace, prevention and

detection of crime, apprehension of criminals, protection of personal and property

rights and enforcement of laws of the State of Tennessee and ordinances of the

metropolitan government."  Charter of the Metropolitan Government of Nashville and

Davidson County, Tennessee, § 8.202.  Defendant Drake is sued in his official capacity.

## FACTUAL ALLEGATIONS

28.     Plaintiffs are organizations that gather and publish the news and

represent the interests of journalists and news organizations working in Tennessee.

29.     Plaintiffs' journalists, photographers, and videographers routinely

document the manner in which law enforcement officers perform official duties in

public places.  Plaintiffs are in the business of regularly publishing newsworthy

information and all employ journalists assigned to cover activities of Tennessee law

enforcement on a regular basis.

30.     Plaintiffs' journalists routinely encounter law enforcement officers,

particularly when covering civil disturbances and protest activity that may involve "the

scene of an alleged crime" or an "ongoing and immediate threat to public safety."

31.      For instance, Nexstar station WKRN in Nashville reported extensively on

protests and civil unrest in 2020 in the wake of the murder of George Floyd, *see, e.g.*,

Joey Gill, *Nashville 'I Will Breathe': Protesters March to Capitol Hill for George Floyd*, WKRN (May 30, 2020), http://bit.ly/448PgHp; as did WREG in Memphis, *see* Courtney Anderson & Mitchell Koch, *Protesters Gather in Downtown Memphis to Demonstrate for George Floyd*, WREG (May 28, 2020), https://bit.ly/436L61F; and WATE in Knoxville, *Knoxville Protestors March Through Downtown for Third Day After Death of George Floyd*, WATE (June 1, 2020), https://bit.ly/43SVLfL.

32.     The same is true of Scripps station WTVF in Nashville.  *See, e.g.*, NewsChannel5, *Police Use Tear Gas to Clear Protesters from the Courthouse Area*, YouTube (May 30, 2020), https://bit.ly/3Gv0c8w.

33.     The same is true of Tennessee Lookout.  *See, e.g.*, J. Holly McCall, *Nashville Riots: Historic Metro Courthouse Burns*, Tenn. Lookout (May 31, 2020), https://perma.cc/E3XR-CTAQ; J. Holly McCall, *Weekend Protests, Riots Rock State*, Tenn. Lookout (June 1, 2020), https://bit.ly/4dZrNLN.

34.     The same is true of the *Tennessean*, Gannett's daily newspaper in Nashville, *see, e.g.*, *Nashville Protesters, Police Clash After 'I Will Breathe' Rally*, Tennessean (May 30, 2020), https://bit.ly/4iViLAl; and the Memphis *Commercial Appeal*, *see, e.g.*, Desiree Stennett et al., *Memphis Protests: Demonstrators Confront Law Enforcement Throughout Sunday Night*, Memphis Com. Appeal (June 1, 2020), https://bit.ly/4dTZsGq.

35.     The same is true of Gray stations WSMV in Nashville, *see, e.g.*, WSMV 4 Nashville, *MNPD Officers Take Knee With Protesters*, YouTube (June 4, 2020),

https://bit.ly/4ixMn6p; Action News in Memphis, *see, e.g.*, Brandon Richard, *Officers in Riot Gear Descend on Beale Street, 201 Poplar*, Action News (May 31, 2020), https://bit.ly/447ZGXM; and WVLT in Knoxville, *"No justice. No peace:" Protest Draws Hundreds to Knoxville*, WVLT (June 5, 2020), https://bit.ly/43U2c2a.

36.     And the same is true of TEGNA stations WATN in Memphis, *see, e.g.*, Jalyn Souchek, *Emotions Boil Over During Fifth Night of Memphis Protests, Tear Gas Used on Protesters*, WATN (June 1, 2020), https://bit.ly/42PfpZh; and WBIR in Knoxville, *see 'It's Gone on for Too Long' | Hundreds of Marchers Return to Downtown Knoxville for Peaceful Protest*, WBIR (June 5, 2020), https://bit.ly/4mTt0Io.

37.     More recently, Plaintiffs have reported on law enforcement's response to encampments and protests at universities throughout Tennessee.  *See, e.g.*, Keenan Thomas & Angela Dennis, *Police Arrest Demonstrators on University of Tennessee Campus*, Knoxville News Sentinel (May 3, 2024), https://bit.ly/42zaGfJ; *What We Know About the 9 Arrested on UT's Campus During Demonstrations*, WBIR (May 3, 2024), https://bit.ly/4lXYD3d; Steven Hale, *Campus Protests: Vanderbilt Students' Pro-Palestine Encampment Enters Second Month*, Nashville Banner (Apr. 26, 2024), https://bit.ly/3S8SdAn; Kenley Hargett, *Vanderbilt University Students Mark 1 Month in Pro-Palestinian Tent Encampment*, WKRN (May 1, 2024), https://bit.ly/3RG3tnI.

38.     All of that coverage required close contact with members of law enforcement and often relied on videos or photographs captured within 25 feet.

39.     Plaintiffs' reporters also routinely come into close contact with state facility protection officers when covering newsworthy events, including protest activity on state property. *See, e.g.*, Adam Friedman, *From Grief to Action in Nashville, Protesters Demand Change at the State Capitol*, Tenn. Lookout (Mar. 30, 2023), https://perma.cc/9TBL-AWSS; Steve Mehling, *Protestors Call on Lawmakers to Vote Down Undocumented Students Bill*, WSMV (Apr. 10, 2025), https://bit.ly/4jQflPV; Jessica Barker & Elisheva Wimberly, *'They Could Make Every Single School in this State a Million Times Safer': Protesters Convene Outside Special Legislative Session*, WKRN (Jan. 27, 2025), https://bit.ly/42zsRBY.

40.     A broad range of other newsworthy events similarly bring Plaintiffs' reporters into close contact with members of Tennessee law enforcement on a routine basis—including at crime scenes,[1] accident scenes, or during disaster response activities—and will continue to do so for the foreseeable future.

41.     In those circumstances, Section 5 of the Act will now put Plaintiffs' reporters at risk of arrest in the course of their routine newsgathering.

---

[1]     *See, e.g.*, Aubriella Jackson, *Parents Rush to Reunification Center After Shooting at Antioch High School*, WKRN (Jan. 22, 2025), https://bit.ly/3RGWn2l; Cassandra Stephenson, *Nashville Shooting Sparks Renewed Pleas for an End to Gun Violence*, Tennessee Lookout (Oct. 14, 2024), https://perma.cc/GKU7-X5YC; Kirsten Fiscus and Craig Shoup, *Suspect Dead After Shooting by DEA Agent Outside Midtown Hotel in Nashville*, Tennessean (Apr. 16, 2025), https://bit.ly/3EJwhJ9.

42.     On May 9, 2025, Governor Bill Lee signed the Act into law, creating the

following, new criminal offense at Tenn. Code Ann. Title 39, Chapter 16, Part 6:

> A person commits an offense who intentionally approaches,
> within twenty-five feet (25'), a law enforcement officer after
> the officer has ordered the person to stop approaching or to
> retreat and the officer is lawfully engaged in the execution of
> official duties[.]

43.     The Act applies whenever an officer is engaged in "(1) A lawful traffic

stop; (2) An active investigation of the scene of an alleged crime; or (3) An ongoing and

immediate threat to public safety"—scenarios broad enough to sweep in most of what

law enforcement officers do in public, from enforcing the law at a public assembly to

conducting disaster response.  But the Act does not require that an individual in fact

interfere—or intend to interfere—with an officer's execution of any of those duties, or

that their presence pose any other risk to any legitimate government interest.

44.     The Act went into effect on July 1, 2025.

45.     The Act directly burdens the exercise of First Amendment rights.

46.     With the Act now in effect, whenever one of Plaintiffs' journalists is told to

retreat while standing within 25 feet of law enforcement, that reporter is put to a choice

between committing a crime or forgoing newsgathering.

47.     For visual journalists in particular, 25 feet is often too far to obtain a clear

line of sight to newsworthy events, especially at crowded public events like protests,

festivals, and major sports games that may involve some degree of lawbreaking.

48. That distance is also too great to reliably capture audio recordings. *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78 (1997) (noting that a 15-foot buffer extends beyond "normal conversational distance").

49. Without audio, video may give the public a misleading or incomplete understanding of an event. When an officer is making an arrest, for instance, Plaintiffs' reporters would not be able to hear at 25 feet whether an officer identified themselves as law enforcement or provided *Miranda* warnings to the individual under arrest.

50. A 25-foot distance is likewise too great for Plaintiffs' journalists to conduct interviews and ask questions of officers or witnesses present on the scene of an event.

51. For journalists and news organizations, there is no adequate substitute for first-hand audio and/or visual recordings, "uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public." *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012).

52. Plaintiffs and their journalists also fear that complying with the Act is not practically possible under the circumstances in which reporters often work.

53. Especially at fast-moving crowd scenes, journalists cannot reliably determine whether they are within 25 feet of a particular officer. *See Schenck*, 519 U.S. at 378 n.9 (noting that it would be "quite difficult" to tell whether speaker attempting to obey 15-foot buffer zone "actually strayed to within 14 or 13 feet").

54.     Reporters also cannot comply when told to withdraw when there is no practical way to retreat through a densely packed crowd, where there is not enough space on a public sidewalk to withdraw without trespassing on private property, or where multiple officers have issued overlapping, contradictory instructions. *See id.* at 378–79 (noting the difficulty that speakers would face in "know[ing] how to remain in compliance" with floating 15-foot buffer zones surrounding multiple individuals).

55.     As a result, the Act burdens and chills Plaintiffs' exercise of their First Amendment rights to document and report on matters of public concern, discouraging Plaintiffs—as well as members of the public and press across Tennessee—from approaching the scene of newsworthy events covered by the Act for fear of arrest.

56.     The Act violates the First Amendment by "vest[ing] unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988).

57.     The Act authorizes officers to issue a dispersal order even if an individual's presence is not obstructive and poses no risk to any legitimate interest.

58.     The Act does not require that dispersal orders be tailored to accommodate the First Amendment right to document government activity.

59.     Lawmakers made no findings to support the choice of a 25-foot buffer or the need for the Act in light of existing Tennessee laws that already prohibit *bona fide* obstruction. *See* Tenn. Code Ann. § 39-16-602 (obstruction of law enforcement officer);

*id.* § 39-17-305 (refusal to obey dispersal order issued in order "to maintain public safety in *dangerous* proximity" to an emergency (emphasis added)).

60.     In addition, the Act is unconstitutionally vague because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

61.     In each of those respects, because a journalist in Tennessee can "stand on a public sidewalk . . . only at the whim of any police officer," the Act poses an "ever-present potential for arbitrarily suppressing First Amendment liberties," including the right to document what officials do in public spaces. *Shuttlesworth*, 382 U.S. at 90–91.

62.     Plaintiffs respectfully ask this Court to issue a declaration that the Act violates the Constitution and an injunction against its enforcement by Defendants.

## COUNT I
### Violation of the Fourteenth Amendment (Void for Vagueness)

63.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

64.     The Act "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago*, 527 U.S. at 56. In both of those respects, the Act is unconstitutionally vague.

65.     Because the Act authorizes officers to order an individual to retreat for any reason (or for no reason at all), it fails to "give adequate warning of the boundary between the permissible and the impermissible." *Id.* at 59.

66.     The Act likewise fails to provide fair notice and an opportunity to comply because reporters cannot workably determine whether they are within the 25-foot bubble in many cases, as when gathering news at a crowded public event.

67.     The Act is independently void for vagueness because the law "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

68.     The Act contains no standards of any kind to guide law enforcement officers in deciding who should be ordered to retreat.

69.     In each respect, the Act violates the Fourteenth Amendment.

## COUNT II

**Violation of the First Amendment (As Applied)**

70.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

71.     Plaintiffs intend to engage in peaceful, nonobstructive newsgathering within 25 feet of law enforcement officers performing their duties in public spaces, including near crime scenes, traffic stops, and settings that may involve a threat to public safety or lawbreaking, such as public assemblies, accidents, or disaster scenes.

72.     Plaintiffs' proposed course of conduct is protected by the First

Amendment.  The Constitution safeguards the right to "gather news," *CBS Inc. v.*

*Young*, 522 F.2d 234, 238 (6th Cir. 1975), including in "public settings" like those in

which Plaintiffs encounter officers, *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022).

73.     The First Amendment also protects the right to observe and document

police activity in public spaces in particular.  *See Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir.

2011); *Fields v. City of Phila.*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*,

848 F.3d 678, 688 (5th Cir. 2017); *Alvarez*, 679 F.3d at 597; *Askins v. Dep't of Homeland Sec.*,

899 F.3d 1035, 1044 (9th Cir. 2018); *Irizarry v. Yehia*, 38 F.4th 1282, 1292 (10th Cir. 2022);

*Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).  And because the First

Amendment "protects conduct and activities necessary for expression," it likewise

protects "approaching" a newsworthy event in order "to carry out plaintiffs' protected

monitoring," *Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023); *see Jordan v. Jenkins*, 73

F.4th 1162, 1170 (10th Cir. 2023).

74.     Plaintiffs' proposed course of conduct is proscribed by the Act.

75.     Criminalizing peaceful, nonobstructive newsgathering advances no

legitimate government interest.  *See, e.g.*, *Glik*, 655 F.3d at 84 (newsgathering "that does

not interfere with the police officers' performance of their duties is not reasonably

subject to limitation"); *Alvarez*, 679 F.3d at 606 (finding no substantial state interest in

restricting recording that is "not disruptive of public order or safety, and carried out by

people who have a legal right to be in a particular public location and to watch and listen to what is going on around them").

76.     Because the Act's scope is untethered from any of the interests that could purportedly justify it, the statute is not narrowly tailored.  *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 405 (6th Cir. 2022) (narrow tailoring requires state not to "burden substantially more speech than is necessary" to further interests and show that it "seriously undertook to address" its concerns "with less intrusive tools" (citation omitted)).

77.     The Act's 25-foot sweep is far broader than necessary to protect any legitimate interest.  *See id.* at 407 (finding 10-foot buffer zone around healthcare facilities was not narrowly tailored and burdened more speech than necessary to achieve any legitimate government interest); *Glik*, 655 F.3d at 80, 84 (individual filming "roughly ten feet away" is at "a comfortable remove" from law enforcement (citation omitted)).

78.     Tennessee has not demonstrated—and cannot demonstrate—that the Act is necessary in light of other Tennessee laws that prohibit conduct that in fact obstructs law enforcement officers in the performance of their duties.  *See Sisters for Life, Inc.*, 56 F.4th at 405 (healthcare buffer zone not narrowly tailored in light of existing restriction on obstruction, "a law whose ends and means fit snugly" with the state's interests).

79.    The Act fails to leave open "alternative observation opportunities," *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017), when 25 feet is too great a distance for Plaintiffs to observe, capture audio or video of events, or speak to witnesses.

80.    The Act is therefore unconstitutional as applied to Plaintiffs' peaceful, nonobstructive efforts to document officers performing duties in public spaces.

## COUNT III
### Violation of the First Amendment (Facial Claim)

81.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

82.    On its face, the Act "restricts access to traditional public fora" and authorizes officers to regulate a sweeping volume of First Amendment-protected activity, including speech and newsgathering.  *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

83.    In its "inevitable effect," the Act is a content-based restriction on newsgathering designed to prevent members of the press and public from exercising the right to document policing and is therefore subject to strict scrutiny.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (citation omitted); *see Brown*, 86 F.4th at 782 (prohibition on "approaching" hunters triggered strict scrutiny where the law's "only evident purpose was to expand the statute to reach expressive activity" in light of existing laws that "already encompassed physical interference").

84.    The Act is not narrowly tailored to a compelling government interest.

85.     Whatever interest Tennessee intended to advance by enacting it, the Act contains no standards channeling officers' discretion toward that interest.

86.      Instead, the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755, and its 25-foot sweep is far broader than necessary to accommodate any legitimate interest.

87.     Even if construed as a content-neutral time, place, or manner restriction or a law that also targets conduct, the Act would still fail any degree of First Amendment scrutiny because it "burden[s] substantially more speech than is necessary" to further the government's interests and fails to leave open adequate alternative channels for newsgathering.  *Sisters for Life, Inc.*, 56 F.4th at 405 (citation omitted).

88.     The statute therefore violates the First Amendment on its face.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request from this Court:

1)     A declaratory judgment that the Act violates the First and Fourteenth Amendments of the U.S. Constitution on its face and as applied to Plaintiffs' peaceful, nonobstructive efforts to document officers performing duties in public spaces;

2)     An injunction restraining Defendants from enforcing the Act against Plaintiffs;

3)     An award of attorney's fees pursuant to 42 U.S.C. § 1988;

4)     Costs of suit; and

5)      Such other and further relief as the Court may deem just and proper.

Dated:  July 22, 2025                          /s/ Paul R. McAdoo
                                                Paul R. McAdoo
                                                pmcadoo@rcfp.org
                                                Grayson Clary*
                                                gclary@rcfp.org
                                                REPORTERS COMMITTEE FOR
                                                  FREEDOM OF THE PRESS
                                                6688 Nolensville Rd. Suite 108-20
                                                Brentwood, TN 37027
                                                Phone: 615.823.3633
                                                Fax: 202.795.9310

                                                *Attorneys for Plaintiffs*

                                                *\* Pro hac vice application forthcoming*