# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

GANNETT CO., INC., GRAY LOCAL
MEDIA, INC., NEXSTAR MEDIA
GROUP, INC., SCRIPPS MEDIA, INC.,
TEGNA INC., NASHVILLE PUBLIC
MEDIA, INC. *d/b/a* NASHVILLE
BANNER, STATES NEWSROOM *d/b/a*
TENNESSEE LOOKOUT,

        *Plaintiffs*,

    v.

JEFF LONG, *in his official capacity as
Commissioner of the Tennessee Department of
Safety and Homeland Security*, GLENN
FUNK, *in his official capacity as District
Attorney General for Nashville & Davidson
County, Tennessee*, and JOHN DRAKE, *in
his official capacity as Chief of Metropolitan
Nashville Police Department*,

        *Defendants.*

CASE NO. 3:25-cv-00830
Hon. William L. Campbell, Jr.
Magistrate Judge Barbara D. Holmes

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

Paul R. McAdoo
pmcadoo@rcfp.org
Grayson Clary*
gclary@rcfp.org
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
6688 Nolensville Rd. Suite 108-20
Brentwood, TN 37027
Phone: 615.823.3633

*Attorneys for Plaintiffs*

* Admitted pro hac vice

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    I.    Tennessee authorizes officers to criminalize approaching within 25 feet
        in settings where the press and public routinely encounter law
        enforcement. ................................................................................................. 4

    II.   Plaintiffs' newsgathering regularly brings their journalists in close
        proximity to officers performing official duties in settings now regulated
        by the Act. .................................................................................................... 5

    III.  The Act burdens Plaintiffs' newsgathering. .............................................. 7

ARGUMENT .................................................................................................................. 9

    I.    Plaintiffs are likely to succeed in demonstrating that the Act violates the
        First and Fourteenth Amendments. ......................................................... 10

        A.    Plaintiffs have standing to challenge the Act. ................................. 10

        B.    The Act is void for vagueness under the Due Process Clause. .................. 13

        C.    The Act violates the First Amendment as applied to Plaintiffs'
               peaceful, nonobstructive newsgathering within 25 feet of police
               officers. ....................................................................................... 17

        D.    The Act violates the First Amendment on its face. ........................ 23

    II.   The remaining factors favor preliminary injunctive relief. ................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Agnew v. District of Columbia,*
   920 F.3d 49 (D.C. Cir. 2019)...................................................................................17

*Am. C.L. Union of Ill. v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012)........................................................................3, 20, 21

*Bankers Life & Cas. Co. v. McDaniel,*
   No. 3:21-CV-00247, 2021 WL 1165974 (M.D. Tenn. Mar. 26, 2021) ..................25

*Bell v. Keating,*
   697 F.3d 445 (7th Cir. 2012)......................................................................15, 17, 24

*Brown v. Kemp,*
   86 F.4th 745 (7th Cir. 2023)...................................................................2, 19, 21, 23

*CBS Inc. v. Young,*
   522 F.2d 234 (6th Cir. 1975)...............................................................................11, 19

*City of Chicago v. Morales,*
   527 U.S. 41 (1999)............................................................................................ *passim*

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988)..............................................................................................13

*Connection Distrib. Co. v. Reno,*
   154 F.3d 281 (6th Cir. 1998)...............................................................................9, 25

*Deep South Today v. Murrill,*
   779 F. Supp. 3d 782 (M.D. La. 2025),
   *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025)................................... *passim*

*Feliciano v. Dep't of Transp.,*
   145 S. Ct. 1284 (2025)..........................................................................................16

*Fischer v. Thomas,*
   52 F.4th 303 (6th Cir. 2022)..................................................................................11

*Glik v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011)................................................................................10, 20

iii

*Hils v. Davis*,
52 F.4th 997 (6th Cir. 2022) ................................................................................................11, 19

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ...................................................................................................................18, 19

*Howard v. Smith Cnty.*,
No. 2:10-0009, 2011 WL 4361486 (M.D. Tenn. Sept. 19, 2011) .........................................16

*Jordan v. Jenkins*,
73 F.4th 1162 (10th Cir. 2023) ...................................................................................................19

*Kareem v. Cuyahoga Cnty. Bd. of Elections*,
95 F.4th 1019 (6th Cir. 2024) ......................................................................................................11

*Kiser v. Reitz*,
765 F.3d 601 (6th Cir. 2014) .........................................................................................................11

*Kolender v. Lawson*,
461 U.S. 352 (1983) ........................................................................................................14, 16, 17

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........................................................................................................20, 23, 24

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016) ........................................................................................................12

*Mills v. Alabama*,
384 U.S. 214 (1966) .......................................................................................................................25

*Nicodemus v. City of South Bend*,
137 F.4th 654 (7th Cir. 2025) ............................................................................................ *passim*

*Pouillon v. City of Owosso*,
206 F.3d 711 (6th Cir. 2000) ......................................................................................................22

*Reporters Comm. for Freedom of the Press v. Rokita*,
751 F. Supp. 3d 931 (S.D. Ind. 2024) ............................................................................12, 13, 15, 17

*Reporters Comm. for Freedom of the Press v. Rokita*,
No. 24-2927, 2025 WL 2218472 (7th Cir. Aug. 5, 2025) ............................................. *passim*

*Russell v. Lundergan-Grimes*,
    784 F.3d 1037 (6th Cir. 2015) ............................................................... 11

*Schenck v. Pro-Choice Network of W. N.Y.*,
    519 U.S. 357 (1997) ................................................................... *passim*

*Shuttlesworth v. City of Birmingham*,
    382 U.S. 87 (1965) ........................................................... 1, 18, 24

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
    56 F.4th 400 (6th Cir. 2022) ......................................... 2, 20, 21, 24

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ............................................................... 12

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) ............................................................................... 13

*Vodak v. City of Chicago*,
    639 F.3d 738 (7th Cir. 2011) ............................................................... 15

**Statutes**

2025 Tenn. Pub. Acts, ch. 409, § 11 ........................................................ 5

2025 Tenn. Pub. Acts, ch. 409, § 5(a) ........................................ *passim*

2025 Tenn. Pub. Acts, ch. 409, § 5(b) ..................................................... 5

2025 Tenn. Pub. Acts, ch. 409, § 5(c) ..................................................... 5

SB 30, 114th Gen. Assemb., Reg. Sess. (Tenn. 2025) ............................ 1

Tenn. Code Ann. § 39-16-602 ................................................................. 1

Tenn. Code Ann. § 39-17-305 ................................................. 2, 16, 21

Tenn. Code Ann. § 40-35-111 ................................................................. 5

Tenn. Code Ann. § 55-8-104 ................................................................ 16

## Other Authorities

Adam Friedman, *From Grief to Action in Nashville, Protesters Demand Change at the State Capitol*, Tenn. Lookout (Mar. 30, 2023),
https://perma.cc/9TBL-AWSS............................................................................7

Brandon Richard, *Officers in Riot Gear Descend on Beale Street, 201 Poplar*,
ActionNews5 (May 31, 2020),
https://bit.ly/447ZGXM ...............................................................................6

Fed. R. Civ. P. 65(c) ......................................................................................25

J. Holly McCall, *Nashville Riots: Historic Metro Courthouse Burns*,
Tenn. Lookout (May 31, 2020),
https://perma.cc/E3XR-CTAQ ......................................................................6

Jalyn Souchek, *Emotions Boil Over During Fifth Night of Memphis Protests, Tear Gas Used on Protesters*, ABC24 (June 1, 2020),
https://bit.ly/42PfpZh ...................................................................................6

Jessica Barker & Elisheva Wimberly, *'They Could Make Every Single School in this State a Million Times Safer': Protesters Convene Outside Special Legislative Session*,
WKRN (Jan. 27, 2025),
https://bit.ly/42zsRBY ...................................................................................7

Joey Gill, *Nashville 'I Will Breathe': Protesters March to Capitol Hill for George Floyd*,
WKRN (May 30, 2020),
http://bit.ly/448PgHp ....................................................................................6

Keenan Thomas & Angela Dennis, *Police Arrest Demonstrators on University of Tennessee Campus*, Knoxville News Sentinel (May 3, 2024),
https://bit.ly/42zaGfJ ....................................................................................6

Kenley Hargett, *Vanderbilt University Students Mark 1 Month in Pro-Palestinian Tent Encampment*, WKRN (May 1, 2024),
https://bit.ly/3RG3tnI....................................................................................6

*Nashville Protesters, Police Clash After 'I Will Breathe' Rally*,
Tennessean (May 30, 2020),
https://bit.ly/4iViLAl.....................................................................................6

NewsChannel5, *Police Use Tear Gas to Clear Protesters from the Courthouse Area*,
 YouTube (May 30, 2020),
 https://bit.ly/3Gv0c8w ...................................................................................................6

Steve Mehling, *Protestors Call on Lawmakers to Vote Down Undocumented Students
 Bill*, WSMV4 (Apr. 10, 2025),
 https://bit.ly/4jQflPV.....................................................................................................7

Steven Hale, *Campus Protests: Vanderbilt Students' Pro-Palestine Encampment Enters
 Second Month*, Nashville Banner (Apr. 26, 2024),
 https://bit.ly/3S8SdAn...................................................................................................6

*What We Know About the 9 Arrested on UT's Campus During Demonstrations*,
 WBIR (May 3, 2024),
 https://bit.ly/4lXYD3d...................................................................................................6

WSMV4 Nashville, *MNPD Officers Take Knee With Protesters*,
 YouTube (June 4, 2020),
 https://bit.ly/4ixMn6p...................................................................................................6

# INTRODUCTION

More than fifty years ago, the Supreme Court made clear that a statute that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" would be so flagrantly unconstitutional as to "need[] no demonstration." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). Tennessee has enacted that statute, delegating police officers standardless discretion to prevent the public and the press from approaching near enough to document the way that officers perform some of their most important public duties. SB 30, 114th Gen. Assemb., Reg. Sess. (Tenn. 2025).

As of July 1, 2025, Section 5 of Public Chapter 409 ("the Act") criminalizes "intentionally approach[ing], within twenty-five feet (25'), a law enforcement officer after the officer has ordered the person to stop approaching or to retreat and the officer is lawfully engaged in the execution of official duties" in common settings where the public encounter police. 2025 Tenn. Pub. Acts, ch. 409, § 5(a). In particular, Section 5 may be invoked whenever an officer is engaged in "(1) A lawful traffic stop; (2) An active investigation of the scene of an alleged crime; or (3) An ongoing and immediate threat to public safety"—scenarios broad enough to sweep in most of what officers do in public, from enforcing the law at a public assembly to conducting disaster response. *Id.* But unlike background Tennessee law, Section 5 does not require that an individual's presence have any impact on an officer's ability to perform their duties, *see* Tenn. Code Ann. § 39-16-602 (prohibiting obstruction of a law enforcement officer), that

their presence be "dangerous," *id.* § 39-17-305, or that any government interest of any kind be at stake, *see Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 405 (6th Cir. 2022) (healthcare buffer-zone law violates First Amendment where "no-obstruction law" already addresses the state's legitimate interests). As a result, Section 5's "only evident purpose" is to magnify officers' discretion "to reach expressive activity that does not involve physical interference," *Brown v. Kemp*, 86 F.4th 745, 782 (7th Cir. 2023).

The Act violates the Constitution. For one, Section 5 is void for vagueness, as other federal courts reviewing police-buffer laws have consistently concluded. *See Reporters Comm. for Freedom of the Press v. Rokita*, No. 24-2927, 2025 WL 2218472, at *6 (7th Cir. Aug. 5, 2025) (Indiana's police-buffer law vague on its face); *Deep South Today v. Murrill*, 779 F. Supp. 3d 782, 828–29 (M.D. La. 2025), *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025) (Louisiana's police-buffer law vague on its face). Missing from the Act's text is any standard to guide officers in deciding which of the countless Tennesseans who pass within 25 feet in covered scenarios should be ordered—on pain of arrest—to retreat. Because it empowers an officer to issue an order for "[a] good reason, a bad reason, [or] a reason the officer just makes up[,]" including "because he had a bad breakfast," *Reporters Comm.*, 2025 WL 2218472, at *6, the Act "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" and "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement," *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).

2

Section 5 likewise violates the First Amendment.  Perhaps most obviously, it violates the First Amendment as applied to newsgathering that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them"—the activity that brings Plaintiffs' reporters within 25 feet of officers on a routine basis in settings where the Act now threatens them with arrest and prosecution.  *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 606 (7th Cir. 2012); *see also Deep South Today*, 779 F. Supp. 3d at 818 (finding that overlapping coalition of news organizations stated a successful as-applied First Amendment claim against Louisiana's police-buffer law).

And the Act further violates the First Amendment on its face.  In a facial First Amendment challenge to an Indiana police-buffer law, the Seventh Circuit recently explained that such a law triggers First Amendment scrutiny on its face because it necessarily restricts access to public fora, *see Nicodemus v. City of South Bend*, 137 F.4th 654, 663–64 (7th Cir. 2025); that it must confront at least intermediate scrutiny, *see id.* at 668–70; and that the dispositive question in that analysis is whether an individual can "comply with the buffer law by remaining in place," or if officers can instead order the press and public to "move away"—forcing them to navigate at their peril a constantly roving "force field," *id.* at 669.  Tennessee's law, unlike Indiana's narrower version, authorizes by its plain text orders "to retreat," 2025 Tenn. Pub. Acts, ch. 409, § 5(a), and as a result its "floating buffer zones burden more speech than necessary to serve the

relevant governmental interests" because it is too difficult "to know how to remain in compliance," *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 378–79 (1997).

In each respect, the Act cannot be reconciled with the Constitution. Plaintiffs—organizations that gather the news in Tennessee, and whose reporters approach within 25 feet of officers on a routine basis in settings where Section 5 now threatens them with criminal penalties—respectfully move this Court to enjoin its enforcement against them.

## BACKGROUND

### I. Tennessee authorizes officers to criminalize approaching within 25 feet in settings where the press and public routinely encounter law enforcement.

On May 9, 2025, Tennessee Governor Bill Lee signed into law SB 30, which, in relevant part, makes it a criminal offense to "intentionally approach[], within twenty-five feet (25′), a law enforcement officer after the officer has ordered the person to stop approaching or to retreat and the officer is lawfully engaged in the execution of official duties" in the common settings where the public encounter police described above. 2025 Tenn. Pub. Acts, ch. 409, § 5(a). Section 5's only affirmative defense provides that no liability attaches if the defendant can show that "the lawful order was not received or understood by the person and was not capable of being received or understood under the conditions and circumstances that existed at the time of the issuance of the order." *Id.* § 5(b). Otherwise, a violation is punishable as a Class B misdemeanor, which, in Tennessee, carries penalties that include up to six months imprisonment or a

fine of up to five hundred dollars.  *Id.* § 5(c); Tenn. Code Ann. § 40-35-111(e)(2).  The Act

went into effect on July 1, 2025.  *See* 2025 Tenn. Pub. Acts, ch. 409, § 11.

## II.    Plaintiffs' newsgathering regularly brings their journalists in close proximity to officers performing official duties in settings now regulated by the Act.

Plaintiffs are organizations that gather and report news in Tennessee.  Gannett

Co., Inc. ("Gannett"), Gray Local Media, Inc. ("Gray"), Nexstar Media Group, Inc.

("Nexstar"), Scripps Media, Inc. ("Scripps"), TEGNA Inc. ("TEGNA"), Nashville Public

Media, Inc. *d/b/a* Nashville Banner (the "Banner"), and States Newsroom *d/b/a*

Tennessee Lookout (the "Lookout") are all in the business of regularly gathering and

publishing newsworthy information, and all employ professional journalists assigned

to cover activities of Tennessee law enforcement in situations in which the Act applies.[1]

For one, Plaintiffs' journalists routinely encounter officers when covering civil

disturbances and protest activity that may involve "the scene of an alleged crime" or an

"ongoing and immediate threat to public safety."  2025 Tenn. Pub. Acts, ch. 409, § 5(a).

Plaintiffs reported extensively on the George Floyd protests in 2020,[2] and more recently

---

[1]    A full list of Plaintiffs' individual stations, newspapers, and other properties in Tennessee that are now regulated by the Act is set forth in the Complaint.  *See* Compl. ¶¶ 18–24 (ECF No. 1).

[2]    *See, e.g.*, Joey Gill, *Nashville 'I Will Breathe': Protesters March to Capitol Hill for George Floyd*, WKRN (May 30, 2020), http://bit.ly/448PgHp; NewsChannel5, *Police Use Tear Gas to Clear Protesters from the Courthouse Area*, YouTube (May 30, 2020), https://bit.ly/3Gv0c8w; J. Holly McCall, *Nashville Riots: Historic Metro Courthouse Burns*, Tenn. Lookout (May 31, 2020), https://perma.cc/E3XR-CTAQ; *Nashville Protesters, Police Clash After 'I Will Breathe' Rally*, Tennessean (May 30, 2020), https://bit.ly/4iViLAl;

covered pro-Palestinian protests and law enforcement's response to those protests at universities throughout Tennessee.[3]  The same is true of demonstrations at the state capitol, *see* Decl. of John Partipilo ("Partipilo Decl.") ¶¶ 4–5;[4] Decl. of Sarah Grace Taylor ("Taylor Decl.") ¶¶ 4–5, and the recent No Kings protest in Nashville, where an individual was photographed being arrested by the Metropolitan Nashville Police Department ("MNPD") for carrying a handgun and allegedly harassing demonstrators, *see* Decl. of Stephen Elliott ("Elliott Decl.") ¶ 13; *see also* Partipilo Decl. ¶ 8–9 (similar at coverage of Abrego Garcia protests in Nashville).  Plaintiffs' reporters also routinely come into close contact with Tennessee Highway Patrol ("THP") and state facility

---

WSMV4 Nashville, *MNPD Officers Take Knee With Protesters*, YouTube (June 4, 2020), https://bit.ly/4ixMn6p; Brandon Richard, *Officers in Riot Gear Descend on Beale Street, 201 Poplar*, ActionNews5 (May 31, 2020), https://bit.ly/447ZGXM; Jalyn Souchek, *Emotions Boil Over During Fifth Night of Memphis Protests, Tear Gas Used on Protesters*, ABC24 (June 1, 2020), https://bit.ly/42PfpZh.

[3]      *See, e.g.*, Keenan Thomas & Angela Dennis, *Police Arrest Demonstrators on University of Tennessee Campus*, Knoxville News Sentinel (May 3, 2024), https://bit.ly/42zaGfJ; *What We Know About the 9 Arrested on UT's Campus During Demonstrations*, WBIR (May 3, 2024), https://bit.ly/4lXYD3d; Steven Hale, *Campus Protests: Vanderbilt Students' Pro-Palestine Encampment Enters Second Month*, Nashville Banner (Apr. 26, 2024), https://bit.ly/3S8SdAn; Kenley Hargett, *Vanderbilt University Students Mark 1 Month in Pro-Palestinian Tent Encampment*, WKRN (May 1, 2024), https://bit.ly/3RG3tnI.

[4]      An original signed copy of the Declaration of John Partipilo was mailed to Counsel for Plaintiffs but did not arrive prior to the filing of this motion.  Plaintiffs intend to move to substitute the original signed copy for the electronically signed copy annexed hereto, in compliance with Local Rule 7.03(e)(4), when the copy arrives.

protection officers in particular when covering newsworthy events on state property.[5]
*See* Taylor Decl. ¶ 5 (close proximity to THP officers "at least a half a dozen times a
week" while Tennessee legislature is in session).  And for the foreseeable future, a
diverse range of other events will bring Plaintiffs' reporters "within 25 feet of law
enforcement officers at least five of the seven days of the week, covering anything from
the state legislature to local government happenings to crime or accident scenes to
protests and large-scale events where [THP] and [MNPD] officers will be present."
Decl. of Michael Rose ("Rose Decl.") ¶ 5.

## III. The Act burdens Plaintiffs' newsgathering.

In the course of that coverage, while Plaintiffs' journalists "know not to cross the
line into obstruction when covering the activities of police," Decl. of Andy Cordan
("Cordan Decl.") ¶ 10, doing their own jobs frequently requires them to "get as close to
the scene as [they] can," *id.* ¶ 6.  For one, Plaintiffs' reporters approach as close to a
newsworthy event as they can to record audio or conduct interviews because it would
be "hard—if not impossible—to get audio of an interview from over 25 feet away,"
Elliott Decl. ¶ 7; *see also* Decl. of Don Dare ("Dare Decl.") ¶ 8 (even with professional

---

[5]     *See, e.g.*, Adam Friedman, *From Grief to Action in Nashville, Protesters Demand
Change at the State Capitol*, Tenn. Lookout (Mar. 30, 2023), https://perma.cc/9TBL-AWSS;
Steve Mehling, *Protestors Call on Lawmakers to Vote Down Undocumented Students Bill*,
WSMV4 (Apr. 10, 2025), https://bit.ly/4jQflPV; Jessica Barker & Elisheva Wimberly,
*'They Could Make Every Single School in this State a Million Times Safer': Protesters Convene
Outside Special Legislative Session*, WKRN (Jan. 27, 2025), https://bit.ly/42zsRBY.

recording equipment, "an interview from 25 feet away just would not be possible"). And in some of the public fora in which Plaintiffs' journalists routinely encounter officers, it would be physically impossible to maintain a distance of more than 25 feet because the space is not large enough. *See* Taylor Decl. ¶¶ 5–8 (state capitol); Elliott Decl. ¶ 5 (Metro Nashville council meetings); *id.* ¶ 9 (encampments on public land).

Plaintiffs' journalists are often asked to move or step back while gathering the news. *See* Partipilo Decl. ¶ 6; Cordan Decl. ¶ 7 ("I *expect* to be asked to step back or move when covering breaking news, because I am arriving quickly and trying to get the best shot that I can from as close as possible."). Before the Act passed, if asked to move by an officer, Plaintiffs' journalists might comply "by backing up by 3–6 feet," Taylor Decl. ¶ 16; might "go elsewhere and look for places that have not been blocked off to get the shot," Dare Decl. ¶ 9; might "wait until [they are] physically pushed back," Partipilo Decl. ¶ 6; or might refuse entirely and "explain to police officers that they don't have any right to tell [them] where [they] can and cannot be as long as [they are] not breaking any laws and [] not interfering with them doing their jobs," Partipilo Decl. ¶ 13. But now that the Act has passed, "the stakes are a lot higher," because Plaintiffs' reporters "can be arrested if [they] do not back up far enough." Taylor Decl. ¶ 16.

As a result, some plan to comply with orders to retreat even if "[they] [do] not think the statute rightfully applie[s] to th[e] situation" in order to avoid arrest. *Id.* ¶ 17; *see also* Cordan Decl. ¶ 11 ("[T]here is no story worth going to jail for."). Others,

though, "would rather risk arrest than comply" if an order to retreat "wasn't justified and would stop [them] from documenting a newsworthy event." Partipilo Decl. ¶ 11; *see also* Elliott Decl. ¶ 15. And some will have no choice one way or the other, either because they cannot reliably estimate 25 feet in the field, *see* Taylor Decl. ¶ 16; Partipilo Decl. ¶ 12, or because they frequently encounter police officers in settings—like a crowded demonstration or packed public spaces at the capitol—where retreating to 25 feet will be impossible, *see* Elliott Decl. ¶ 14; Taylor Decl. ¶ 8; Partipilo Decl. ¶ 12.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction prohibiting Defendants from enforcing Section 5 against them. In First Amendment cases like this one, "likelihood of success on the merits often will be the determinative factor," because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citations omitted). Here, Plaintiffs are likely to succeed in demonstrating that the Act violates both the First and Fourteenth Amendments; an injunction would serve the public interest by safeguarding the function of a free press.

I. **Plaintiffs are likely to succeed in demonstrating that the Act violates the First and Fourteenth Amendments.**

The Act is void for vagueness under the Due Process Clause, as the Seventh Circuit recently explained in invalidating another state's police-buffer law, because it affords officers discretion "to subject any pedestrian to potential criminal liability by simply ordering them not to approach, even if the pedestrian is doing nothing more than taking a morning stroll or merely walking up to an officer to ask for directions." *Reporters Comm.*, 2025 WL 2218472, at *6. The Act likewise violates the First Amendment, both as applied to Plaintiffs' newsgathering—because reporting "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation," *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011)—and on its face, because Section 5's "floating buffer zones burden more speech than necessary to serve the relevant governmental interests" Tennessee may claim. *Schenck*, 519 U.S. at 379. On each of those independent bases, Plaintiffs' claims are likely to succeed on the merits.

A. **Plaintiffs have standing to challenge the Act.**

As a threshold matter, Plaintiffs have standing to challenge Section 5. *See Reporters Comm.*, 2025 WL 2218472, at *4 (news outlets established standing to challenge buffer law by "submitt[ing] affidavits from their journalist members or employees explaining that they conduct newsgathering activities in proximity to police officers every day"). A plaintiff in a pre-enforcement challenge satisfies Article III's injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (citation omitted). "[P]ast enforcement is not necessary to establish a credible threat of enforcement," *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1025–26 (6th Cir. 2024); the prospect of enforcement need only be "reasonably founded in fact," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2015) (citation omitted). That standard is especially lenient in First Amendment cases, where the "rationale for pre-enforcement challenges applies with particular force" because "self-censorship is a harm that can be realized even without an actual prosecution." *Kareem*, 95 F.4th at 1023 (citation and internal quotation marks omitted). On that footing, in evaluating whether a credible threat exists, "the first and most important factor is whether the challenged action chills speech" in practice. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

That standard is more than satisfied here. As to whether the activity arguably proscribed by Section 5 is affected with a constitutionally protected interest, the Sixth Circuit has made clear that the First Amendment safeguards the right to "gather news," *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975), including in "public settings" like those in which Plaintiffs encounter officers, *Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022). For just that reason, the Seventh Circuit recently explained that Indiana's similar (though in respects narrower) police-buffer law was "subject to First Amendment scrutiny," even though the law said "nothing about speech on its face," because "it

restricts those who want to engage in protected First Amendment activity from accessing traditional public forums" and inevitably burdens the right to document police. *Nicodemus*, 137 F.4th at 663–64 (citation and internal quotation marks omitted).

Plaintiffs also face a credible threat that Section 5 will be enforced against them. For one, as to "a history of past enforcement," *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016), Plaintiffs' reporters have described that their First Amendment activity routinely drew instructions to retreat in scenarios where the Act now criminalizes noncompliance, *see* Partipilo Decl. ¶ 6; Cordan Decl. ¶ 7; Taylor Decl. ¶ 16. As a result, those same orders now force Plaintiffs to choose between "self-censorship" and "flouting the buffer law." *Reporters Comm.*, 2025 WL 2218472, at *4; *cf. Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (plaintiff had standing to challenge policy based on "objective chill" because the prospect of being referred for a sanction "itself is chilling even if it does not result in a finding of responsibility or criminality").

Moreover, the Act has an attribute that "makes enforcement easier or more likely," *McKay*, 823 F.3d at 869—namely, it vests all law enforcement officers throughout Tennessee with discretion to decide when to summon a 25-foot forcefield, for any reason or for no reason, *see Reporters Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 940 (S.D. Ind. 2024), *aff'd,* 2025 WL 2218472 (threat of buffer law's enforcement credible in light of "the number of law enforcement departments—let alone individual officers—in Indiana" authorized to issue an order under the statute).

And as the Supreme Court has often underlined, immediate pre-enforcement review is especially urgent where a law "allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988), because the statute's standardless sweep "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused," *id.* at 757; *see also Thornhill v. Alabama,* 310 U.S. 88, 97–98 (1940) (same with respect to a vague criminal statute in particular).

That injury is fairly traceable to Defendants, who are charged by state law with enforcing the Act in settings where Plaintiffs' reporters routinely encounter law enforcement officers, and a preliminary injunction would redress those injuries for much the same reason. *See Deep South Today*, 779 F. Supp. 3d at 805 (injury caused by police-buffer law redressable by enjoining heads of law enforcement agencies "empowered to give an order under the Act" and the relevant prosecuting authorities). Plaintiffs therefore have standing to seek preliminary relief from the Act's enforcement.

**B.    The Act is void for vagueness under the Due Process Clause.**

Though Section 5's First Amendment harms are serious, the most straightforward basis for granting relief is the Act's vagueness, as federal courts reviewing police-buffer laws have consistently concluded. *See Reporters Comm.*, 2025 WL 2218472, at *6; *Deep South Today*, 779 F. Supp. 3d at 828–29. Even a statute with no impact on First Amendment rights is "impermissibly vague"—and thus a violation of

the Due Process Clause—if it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests," *Morales*, 527 U.S. at 52 (plurality opinion). The Act falls short: Because an officer can order individuals to retreat for any reason or for no reason at all, it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," *id*. at 56 (plurality opinion), and it "encourage[s] arbitrary and discriminatory enforcement," *Reporters Comm.*, 2025 WL 2218472, at *7 (citation omitted).

Start with arbitrary discretion, the "more important aspect of vagueness doctrine." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). In *City of Chicago v. Morales*, a majority of the Supreme Court held that a lawful-order statute "violates the requirement that a legislature establish minimal guidelines to govern law enforcement," 527 U.S. at 60 (citation and internal quotation marks omitted), if it "does not provide any guidance to the officer deciding whether such an order should issue" in the first place, *id.* at 62; *see also Reporters Comm.*, 2025 WL 2218472, at *6. Or to approach the question from the opposite direction, if such a law does not "limit dispersal authority to situations in which dispersal is *necessary* to ensure [public] safety and order," it "permits law enforcement too much discretion" in violation of due process. *Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012). And like the other police-buffer statutes that Tennessee copied, Section 5 poses just that problem because its plain text "lacks standards for officers to guide them in deciding who should be ordered to move and

under what circumstances." *Reporters Comm.*, 751 F. Supp. 3d at 944–46 (internal

quotation marks and alterations omitted); *see also Deep South Today*, 779 F. Supp. 3d at

823–24 (enjoining Louisiana's police-buffer law on that ground).  Countless individuals

pass within 25 feet of officers in scenarios covered by the Act, but whether to order

some, all, or none of them to stop or retreat—on threat of arrest—is a decision about

which Section 5 simply has nothing to say.  Instead, an officer could just as well issue an

order "because he had a bad breakfast." *Reporters Comm.*, 2025 WL 2218472, at *6.

That the Act only applies when an officer is engaged in duties involving a traffic

stop, the scene of an alleged crime, or an ongoing threat to public safety does nothing to

supply the missing standard.  For one, those scenarios are broad enough to net most of

the settings in which the press and public encounter law enforcement officers; any

minor offense that might take place at a large public assembly, for instance, would

make the event "the scene of an alleged crime." *Cf. Vodak v. City of Chicago*, 639 F.3d

738, 750 (7th Cir. 2011) ("Nothing is more common than for mass arrests in riots or

demonstrations to net a sizable percentage of innocents."); *see also* Elliott Decl. ¶ 13;

Partipilo Decl. ¶ 8 (noting arrest of an armed individual at a No Kings protest).

But more fundamentally, what Section 5's plain text does *not* require is any

causal relationship between the order to retreat and the duties the officer "is lawfully

engaged in," 2025 Tenn. Pub. Acts, ch. 409, § 5(a); *cf. Feliciano v. Dep't of Transp.*, 145 S.

Ct. 1284, 1290 (2025) (statute providing benefits for active-duty service "during a

national emergency" required only a temporal rather than a "substantive" connection to an emergency). Comparison to background Tennessee law makes that point clear. Tennessee's disorderly conduct statute already prohibits refusal "to obey an official order to disperse *issued to maintain public safety* in *dangerous* proximity to a fire, hazard or other emergency"—language that makes clear that an order must have a particular purpose (public safety) and that an individual's proximity must itself jeopardize that purpose. Tenn. Code Ann. § 39-17-305 (emphasis added); *see also, e.g., Howard v. Smith Cnty.*, No. 2:10-0009, 2011 WL 4361486, at *7 (M.D. Tenn. Sept. 19, 2011) (authority "to direct, control, or regulate traffic" authorized "commands to step back" while officer was "engaged in a traffic stop" (quoting Tenn. Code Ann. § 55-8-104)). But Section 5 omits any such substantive link between the duties the officer is performing and the order to retreat, offering no "guidance to the officer deciding whether such an order should issue," *Morales*, 527 U.S. at 62 (majority opinion). That defect invalidates the statute "on its face," *Kolender*, 461 U.S. at 361, because every application of Section 5 "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat," *id.* at 360 (citation, alterations, and internal quotation marks omitted); *see Reporters Comm.*, 2025 WL 2218472, at *6 (Indiana's buffer law vague on its face).

Section 5 likewise fails to provide fair notice. In the context of liability for failure to obey a law enforcement order, due process requires that a law provide "warning about the behavior that [can] prompt[] a lawful dispersal order," *Bell*, 697 F.3d at 462,

not just notice of what to do *after* an (arbitrary) order is issued, *see Agnew v. District of Columbia*, 920 F.3d 49, 60 (D.C. Cir. 2019) (where the standards for issuing a move-on order are themselves vague, "[a] person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability"). Otherwise, a statute that read "do what any officer tells you to do" would provide fair notice despite affording citizens no ability to conduct themselves so as to avoid a confrontation with law enforcement. But here, Section 5 authorizes officers to order an individual to retreat for any reason (or no reason), and "[s]uch an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible," *Morales*, 527 U.S. at 59 (plurality opinion); *see also Reporters Comm.*, 751 F. Supp. 3d at 944 (same); *Deep South Today*, 779 F. Supp. 3d at 823–24 (same). Each time Plaintiffs' reporters approach within 25 feet officers in the course of their daily work, whether an officer will opt to criminalize their conduct represents a pure roll of the dice.

In each respect, the Act—like any other law that purports to grant officers the authority "to decide arbitrarily which members of the public they will order to disperse"—is "indistinguishable from the law . . . held invalid in *Shuttlesworth v. Birmingham*, [382 U.S. 87, 90 (1965)]." *Morales*, 527 U.S. at 58–59 (plurality opinion). This Court should grant an injunction prohibiting its enforcement against Plaintiffs.

**C.** **The Act violates the First Amendment as applied to Plaintiffs' peaceful, nonobstructive newsgathering within 25 feet of police officers.**

The Act likewise violates the First Amendment as applied to Plaintiffs'

newsgathering. *See Deep South Today*, 779 F. Supp. 3d at 818 (finding that news

organizations stated an as-applied First Amendment claim against Louisiana's police-

buffer law). As detailed above, Plaintiffs' reporters regularly gather and report the

news within 25 feet of officers performing their duties—documenting events they could

neither see, hear, nor record if forced to retreat as far as Section 5 requires. The Act now

authorizes any officer in the state to criminalize that nonobstructive newsgathering at

the drop of a hat, but the statute is not tailored to any interest Tennessee might assert.

Where plaintiffs bring an as-applied, pre-enforcement challenge to a statute on

First Amendment grounds, a court must first ask whether "as applied to plaintiffs the

conduct triggering coverage under the statute" implicates the First Amendment, *Holder*

*v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010), and, next, whether the statute satisfies

the relevant standard of review as applied to "the particular speech plaintiffs propose to

undertake," *id.* at 36. Both steps of that analysis are straightforward in this case.

As to the first question, Plaintiffs' activity—approaching within 25 feet of officers

to gather news—is protected by the First Amendment. The Constitution protects the

right to "gather news," *CBS*, 522 F.2d at 238, including "a general First Amendment

right to gather information in public settings," *Hils*, 52 F.4th at 1002. And because "the

First Amendment protects conduct and activities necessary for expression," it likewise

protects "approaching" a newsworthy event in order "to carry out plaintiffs' protected

monitoring and recording," *Brown*, 86 F.4th at 779; *see also Nicodemus*, 137 F.4th at 663–64 (police-buffer law regulates First Amendment activity). As the Tenth Circuit has held in the context of policing in particular, "since the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable police conduct," because if "police could stop criticism or filming by asking onlookers to leave," officers could "bypass the Constitution." *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (citation omitted). That is, of course, exactly what Section 5 was designed to enable—a First Amendment end run.

But the Constitution is not that easily foiled. At a minimum, Section 5 regulates the 'place' of First Amendment activity—not within 25 feet of a law enforcement officer—and must confront intermediate scrutiny. *See Nicodemus*, 137 F.4th at 668–70 (police-buffer law triggers intermediate scrutiny); *Deep South Today*, 779 F. Supp. 3d at 818 (same). In particular, to survive review, the statute must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Nicodemus*, 137 F.4th at 664 (citation omitted). But Section 5 clearly flunks both those requirements as applied to Plaintiffs' newsgathering. For one, criminalizing peaceful, nonobstructive newsgathering advances no legitimate—let alone compelling—government interest that Tennessee might assert. *See, e.g., Glik*, 655 F.3d at 84 (newsgathering "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation"); *Alvarez*, 679 F.3d at 606 (finding

no substantial state interest in restricting recording that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them").

Even if legitimate interests were at stake in forcing Plaintiffs' reporters to retreat, though, Section 5's text does nothing to channel officers' discretion towards those interests—it does not hinge the power to issue an order on obstruction, or public safety. And as the Sixth Circuit has already explained, because intermediate scrutiny requires proof that the state "'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it,'" *Sisters for Life*, 56 F.4th at 404 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)), a buffer zone cannot survive First Amendment review if a "no-obstruction law," whose "ends and means fit snugly," would address the state's interests while burdening substantially less speech, *id.* at 405–06. *Sisters for Life* is directly on point here, where Tennessee's disorderly conduct statute already prohibits failure to obey orders to disperse when an individual's proximity is itself "dangerous," Tenn. Code Ann. § 39-17-305, leaving the Act nothing to do but punish "expressive activity that does not involve physical interference," *Brown*, 86 F.4th at 782.

If that weren't enough, the failure to leave open adequate alternative channels for Plaintiffs' newsgathering would likewise suffice to conclude Section 5 cannot survive intermediate scrutiny. As other courts have observed, "audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating

news," and it is "highly unlikely that other methods could be considered reasonably adequate substitutes."  *Alvarez*, 679 F.3d at 607.  But as Plaintiffs' declarants explain, 25 feet is too great a distance to record audio or conduct interviews.  Elliott Decl. ¶ 7; Dare Decl. ¶ 8; *see also Schenck*, 519 U.S. at 377–78 (noting that 15 feet is beyond "normal conversational distance").  As a result, in practice, Section 5 is a flat ban on those activities, not just an incidental burden.  *See Sisters for Life*, 56 F.4th at 405 (buffer zone prevents "close, personal conversations" (citation omitted)).[6]  What's more, the statute's 25-foot bubble will exclude Plaintiffs' reporters from some critical spaces in their entirety—for instance, in public spaces at the state capitol where demonstrations are often carried out (and individuals are frequently detained).  *See* Taylor Decl. ¶¶ 5–9; Elliott Decl. ¶ 5; *see also Pouillon v. City of Owosso*, 206 F.3d 711, 717 (6th Cir. 2000) (state capitol buildings are public fora for First Amendment purposes).  On that ground, too, the law violates the First Amendment as applied to Plaintiffs' lawful newsgathering.

Finally, all of these difficulties are exacerbated by the "floating nature" of Tennessee's buffer zone.  *Nicodemus*, 137 F.4th at 670.  In *Nicodemus*, the Seventh Circuit explained that Supreme Court precedent recognizes a critical distinction between two

---

[6]    In *Nicodemus*, in the context of a facial challenge brought by a videographer, the Seventh Circuit found that Indiana's police-buffer law left open ample alternative channels of communication, partly because Indiana's buffer did not "float[]" (Tennessee's does) and in part because "'conversational distance' is less relevant to a videographer seeking to record police activity rather than to engage in conversation." 137 F.4th at 670.  Here, of course, Plaintiffs do in fact approach to speak to sources.

kinds of buffer-zone laws: those with which an individual can comply "by remaining in place," *id.* at 669, and those which float, *see id.* at 670. "[F]loating buffer zones burden more speech than necessary to serve the relevant governmental interests" because it is too difficult "to know how to remain in compliance," *Schenck*, 519 U.S. at 378–79; the press and public must be "in constant motion and constantly on alert" to make sure they do not stray within the prohibited distance, *Nicodemus*, 137 F.4th at 670.

The Seventh Circuit ultimately concluded—while reserving judgment on as-applied challenges, *see id.*—that Indiana's statute was not facially overbroad because it only "allows officers to order people to stop approaching, but not to move away," *id.* at 669. (As noted above, the Seventh Circuit went on to find that the statute was nevertheless void for vagueness. *See Reporters Comm.*, 2025 WL 2218472, at *6.) But here in Tennessee, the law's plain text differs from Indiana's statute on that exact point: it authorizes "order[s] . . . to stop approaching *or to retreat*." 2025 Tenn. Pub. Acts, ch. 409, § 5(a) (emphasis added). As a result, Tennessee's law poses exactly the First Amendment difficulties the Seventh Circuit construed Indiana's to avoid—Plaintiffs' reporters face a staggering risk of "inadvertent non-compliance" when an officer, to say nothing of multiple officers, summons a moving 25-foot forcefield. *Nicodemus*, 137 F.4th at 670. The result is that Section 5 burdens wildly more speech than necessary. It violates the First Amendment as applied to Plaintiffs' nonobstructive newsgathering.

**D.    The Act violates the First Amendment on its face.**

Finally, Section 5 likewise violates the First Amendment on its face.  Even setting aside the fact that the statute can be triggered by "approaching" newsworthy events in order "to carry out plaintiffs' protected monitoring and recording," *Brown*, 86 F.4th at 779, all of Section 5's applications implicate the First Amendment because, even if it "says nothing about speech on its face," the statute nevertheless "restricts access to traditional public fora and is therefore subject to First Amendment scrutiny," *McCullen*, 573 U.S. at 476; *see also Nicodemus*, 137 F.4th at 663–64 (same in facial challenge to Indiana's police-buffer statute).  But the Act cannot survive any degree of First Amendment scrutiny for substantially the same reasons already given above.

For one, rather than peg the authority to issue an order to whatever government interests Tennessee might assert, Section 5 allows officers to issue an order for any reason or for no reason—because the moon is high or the tides are low.  *See Bell*, 697 F.3d at 459 (statute authorizing dispersal orders that could be issued "to individuals exercising protected First Amendment rights" without any showing that dispersal would be "necessary" violated First Amendment on its face).  Tennessee cannot explain, for that matter, why "available generic criminal statutes" fail to address whatever interest the Act notionally serves.  *McCullen*, 573 U.S. at 492; *see also Sisters for Life*, 56 F.4th at 405 (invalidating 10-foot buffer zone on that ground).  And as just discussed, the "floating nature" of Tennessee's buffer zone will make compliance virtually

impossible in practice, *Nicodemus*, 137 F.4th at 670, "burden[ing] more speech than

necessary to serve the relevant governmental interests," *Schenck*, 519 U.S. at 378–79.

Ultimately, the First Amendment complements what due process likewise makes

clear:  A law that "says that a person may stand on a public sidewalk . . . only at the

whim of any police officer" violates the Constitution, *Shuttlesworth*, 382 U.S. at 90,

whether because it provides for "government by the moment-to-moment opinions of a

policeman on his beat," *id.* (citation omitted), or because of "its ever-present potential

for arbitrarily suppressing First Amendment liberties," *id.* at 91.  The Act poses just that

danger—including to the work Plaintiffs carry out within 25 feet of officers every day.

## II.    The remaining factors favor preliminary injunctive relief.

The rest of the preliminary-injunction factors follow the merits, and this Court

should enjoin Defendants from enforcing the Act against Plaintiffs.  In cases like this

one that involve a chilling effect on the exercise of First Amendment rights, irreparable

harm is necessarily shown when plaintiffs demonstrate a likelihood of success on the

merits, because the "loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury," and "it is always in the public

interest to prevent the violation of a party's constitutional rights."  *Connection Distrib.*

*Co.*, 154 F.3d at 288 (citations omitted); *see also Reporters Comm.*, 2025 WL 2218472, at *5

(same in buffer-law challenge).  Here, an injunction that shields the press from the Act's

chilling effects—relieving Plaintiffs of the threat of arrest and the need for self-

censorship—would serve the "major purpose" of the First Amendment in Tennessee: "to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). A preliminary injunction should therefore be entered here.[7]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing the Act against them.

Dated: August 22, 2025

Respectfully submitted,

*/s/ Paul R. McAdoo*
Paul R. McAdoo
pmcadoo@rcfp.org
Grayson Clary*
gclary@rcfp.org
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
6688 Nolensville Rd. Suite 108-20
Brentwood, TN 37027
Phone: 615.823.3633
Fax: 202.795.9310

*Attorneys for Plaintiffs*

* *Admitted pro hac vice*

---

[7] Plaintiffs respectfully request waiver of a bond, *see* Fed. R. Civ. P. 65(c), since the "costs of compliance" with a preliminary injunction here "should be virtually non-existent," *Bankers Life & Cas. Co. v. McDaniel*, No. 3:21-CV-00247, 2021 WL 1165974, at *6 (M.D. Tenn. Mar. 26, 2021).