**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| GANNETT CO., INC., *et al.*, | |
| *Plaintiffs*, | |
| | Case No. 3:25-cv-830 |
| v. | Chief District Judge Campbell |
| | Magistrate Judge Holmes |
| JEFF LONG, *et al.*, | |
| *Defendants*. | |

**COMMISSIONER LONG AND GENERAL FUNK'S RESPONSE**
**IN OPPOSITION TO THE MOTION FOR PRELIMINARY RELIEF**

# TABLE OF CONTENTS

Introduction ........................................................................................................................1

Background .........................................................................................................................1

Argument ...........................................................................................................................3

I.  The Media Companies will likely lose this lawsuit. ................................................4

    A.  The Media Companies lack justiciable causes of action. ...................................4

    B.  The Media Companies lack standing. ................................................................7

    C.  The Media Companies' constitutional theories are meritless. ...........................8

        1.  The Bystander Protection Act does not deny anyone due process................8

        2.  The Bystander Protection Act does not violate the First Amendment. .......10

II.  The Media Companies have failed to show the equities tip in their favor............13

III. Any grant of relief must be narrow, context specific, and party oriented..............15

Conclusion .......................................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez*,
  585 U.S. 579 (2018) ...................................................................................................... 15

*Ammex, Inc. v. Cox*,
  351 F.3d 697 (6th Cir. 2003) ..................................................................... 4, 6, 14, 16

*Bell v. Keating*,
  697 F.3d 445 (7th Cir. 2012) ......................................................................................... 9

*Boyle v. Anderson*,
  68 F.3d 1093 (8th Cir. 1995) .................................................................................. 6, 17

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ...................................................................................................... 11

*Cady v. Dombrowski*,
  413 U.S. 433 (1973) ........................................................................................................ 2

*Cantrell v. DeKalb Cnty.*,
  78 S.W.3d 902 (Tenn. Ct. App. 2001) ......................................................................... 2

*Chambers v. Sanders*,
  63 F.4th 1092 (6th Cir. 2023) ............................................................................. 4, 5, 16

*Chapman v. United States*,
  500 U.S. 453 (1991) ........................................................................................................ 8

*Cheatham v. Harris*,
  2012 WL 2873682 (E.D. Tenn. July 12, 2012) .......................................................... 2

*Christian Healthcare Ctrs., Inc. v. Nessel*,
  117 F.4th 826 (6th Cir. 2024) ....................................................................................... 5

*Claybrook v. Birchwell*,
  199 F.3d 350 (6th Cir. 2000) ........................................................................................ 5

*Colten v. Kentucky*,
  407 U.S. 104 (1972) ........................................................................................................ 2

*Crawford v. U.S. Dep't of Treasury*,
  868 F.3d 438 (6th Cir. 2017) ........................................................................................ 6

*Crugher v. Prelesnik*,
  761 F.3d 610 (6th Cir. 2014) ...................................................................................... 16

*State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) ........................................................................................ 3

*Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*,
  59 F.4th 772 (6th Cir. 2023) ......................................................................................... 7

*Doe v. Duling*,
  782 F.2d 1202 (4th Cir. 1986) .................................................................................... 15

*Doe v. Lee*,
  102 F.4th 330 (6th Cir. 2024) ..................................................................................... 15

*Doe v. Lee*,
  137 F.4th 569 (6th Cir. 2025) .......................................................................... 1, 3, 15

Case 3:25-cv-00830   Document 20   Filed 09/12/25   Page 3 of 24 PageID #: 137

*Ernst v. Rising*,
   427 F.3d 351 (6th Cir. 2005) ................................................................................. 5

*Flast v. Cohen*,
   392 U.S. 83 (1968) ..................................................................................... 6, 17

*Friends of George's, Inc. v. Mulroy*,
   108 F.4th 431 (6th Cir. 2024) ............................................................................. 5, 6

*Glik v. Cunniffe*,
   655 F.3d 78 (1st Cir. 2011) ............................................................................ 11, 12

*Grider v. Abramson*,
   180 F.3d 739 (6th Cir. 1999) ........................................................................... 12, 13

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ........................................................................................ 14

*Hewitt v. Helms*,
   482 U.S. 755 (1987) ........................................................................................ 16

*Hils v. Davis*,
   52 F.4th 997 (6th Cir. 2022) ............................................................................... 11

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ......................................................................................... 8

*Jaco v. Bloechle*,
   739 F.2d 239 (6th Cir. 1984) ............................................................................. 5, 6

*James B. Oswald Co. v. Neate*,
   98 F.4th 666 (6th Cir. 2024) .............................................................................. 13

*Jordan v. Jenkins*,
   73 F.4th 1162 (10th Cir. 2023) ........................................................................... 11

*Kallstrom v. City of Columbus*,
   136 F.3d 1055 (6th Cir. 1998) ............................................................................. 16

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ............................................................................... 15

*King v. Burwell*,
   576 U.S. 473 (2015) ........................................................................................ 15

*King v. Shoate*,
   2023 WL 4188051 (W.D. Tenn. June 26, 2023) ............................................................ 9

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ......................................................................................... 7

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) ................................................................ 6, 14, 15, 16

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ............................................................................... 4

*Lichtenstein v. Hargett*,
   83 F.4th 575 (6th Cir. 2023) ......................................................................... 10, 11, 12

*Lindke v. Freed*,
   601 U.S. 187 (2024) ......................................................................................... 4

*Mackey v. Rising*,
   106 F.4th 552 (6th Cir. 2024) .............................................................................. 4

*McLemore v. Gumucio*,
   --- F.4th ----, 2025 WL 2319119 (6th Cir. 2025) ....................................................... 10

iii

*McLemore v. Gumucio,*
2023 WL 4080102 (6th Cir. June 20, 2023) ........................................................ 1

*Nat. Res., Inc. v. Tatum,*
58 F.3d 1101 (6th Cir. 1995) ............................................................................... 8

*Nicodemus v. City of S. Bend, Indiana,*
137 F.4th 654 (7th Cir. 2025) .............................................................................. 7

*Ohio ex rel. Celebrezze v. NRC,*
812 F.2d 288 (6th Cir. 1987) ............................................................................. 14

*Parks v. City of Columbus,*
395 F.3d 643 (6th Cir. 2005) ............................................................................... 2

*People v. Jennings,*
347 N.Y.S.2d 818 (J. Ct. 1973) ........................................................................... 9

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock,*
993 F.2d 800 (11th Cir. 1993) ............................................................................. 7

*Scott v. Schedler,*
826 F.3d 207 (5th Cir. 2016) ............................................................................. 16

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.,*
56 F.4th 400 (6th Cir. 2022) ........................................................................... 3, 4

*Smith v. City of Troy,*
874 F.3d 938 (6th Cir. 2017) ............................................................................. 16

*State v. Danny Schultz Chevrolet, Inc.,*
No. 03C01-9104-CR-116, 1992 WL 134452 (Tenn. Crim. App. June 17, 1992) ..................... 5

*State v. McCormick,*
494 S.W.3d 673 (Tenn. 2016) .............................................................................. 2

*Susselman v. Washtenaw Cnty. Sheriff's Off.,*
109 F.4th 864 (6th Cir. 2024) ............................................................................. 4

*Tennessee v. U.S. Dep't of Ed.,*
104 F.4th 577 (6th Cir. 2024) ........................................................................... 15

*Texas v. ICC,*
258 U.S. 158 (1922) ......................................................................................... 16

*Thompson v. DeWine,*
976 F.3d 610 (6th Cir. 2020) ............................................................................... 4

*TowerCo 2013, LLC v. Berlin Twp. Bd. of Trs.,*
110 F.4th 870 (6th Cir. 2024) ........................................................................... 14

*Trump v. CASA, Inc.,*
145 S. Ct. 2540 (2025) ...................................................................................... 16

*Turner v. Driver,*
848 F.3d 678 (5th Cir. 2017) ............................................................................. 12

*Union Home Mortg. Corp. v. Cromer,*
31 F.4th 356 (6th Cir. 2022) ............................................................................. 16

*Vidal v. Elster,*
602 U.S. 286 (2024) ......................................................................................... 10

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ........................................................................................... 8

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) .................................................................................... 4, 5, 16

iv

*Willeford v. Klepper,*
  597 S.W.3d 454 (Tenn. 2020) ................................................................ 8
*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................ 4

Statutes

Tenn. Code Ann. § 39-17-305 ................................................................ 2, 9
Tenn. Code Ann. § 39-16-602 ................................................................ 3
Tenn. Code Ann. § 39-17-305(a)(2) ...................................................... 8, 9
Tenn. Code Ann. § 55-8-104(a) .............................................................. 9
Tenn. Code Ann. §§ 38-3-102, -108 ...................................................... 2
Tenn. Code Ann. § 55-8-104 .................................................................. 3, 8, 9

Rules

Fed. R. Civ. P. 65(d)(l) ........................................................................ 16

Other Authorities

*Law and Orders,*
  123 Colum. L. Rev. 943 (2023) ............................................................ 2

## INTRODUCTION[*]

This lawsuit is premature and meritless; the Court should not grant preliminary relief. The plaintiffs are several large mass-media conglomerates that own various newspapers and television stations. *See* Compl., Dkt. 1 at 4-7. They seek judicial veto of a newly enacted law that has yet to be interpreted or enforced by any Tennessee police officer, prosecutor, or court. *See id.* at 20. This law does not regulate the Media Companies themselves, but they fear their employees might violate it someday. *See id.* at 11-14. And rather than helping to defend those employees if that "potentialit[y]" comes to pass, the Media Companies ask for a protective advisory opinion from this Court. *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *2 (6th Cir. June 20, 2023); *see* Prelim. Inj. Mot., Dkt. 19 at 67-68.

This Court should not grant such relief — much less without requiring the Media Companies to secure final judgment. Far from presenting a "very clear case[]" for all-but-guaranteed victory, the Media Companies put forward constitutional claims plagued by threshold issues and substantive flaws. *Doe v. Lee* (*Lee II*), 137 F.4th 569, 575 (6th Cir. 2025) (quoting Joseph Story, 2 Commentaries on Equity Jurisprudence § 959(b), at 303 (6th ed. 1853)). Most notably, their claims depend on reading the terms of the challenged law out of context and bending those terms to extremes. And they likewise offer no coherent support for the idea that the equities run in their favor. The Court should deny the Media Companies' motion for preliminary injunction.

## BACKGROUND

In Tennessee and elsewhere, we expect a lot from the police. We charge them with "statutory responsibility to suppress breaches of the peace," mainly by "arrest[ing] persons" suspected of committing crimes. *Cantrell v. DeKalb Cnty.*, 78 S.W.3d 902, 907 (Tenn. Ct. App. 2001) (citing

---

[*] Pincites to docket entries use the Page ID file-stamp pagination.

Tenn. Code Ann. §§ 38-3-102, 108). But we also expect them to *prevent* crime, direct traffic, diffuse dangerous situations, and perform a host of "community caretaking functions." *State v. McCormick*, 494 S.W.3d 673, 681 (Tenn. 2016) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)); *see State ex rel. Thompson v. Reichman*, 188 S.W. 33d, 227–28 (Tenn. 1916); *see also Colten v. Kentucky*, 407 U.S. 104, 109 (1972); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005). Of course, this routinely brings police into close contact with other persons who are not on their best behavior. *See, e.g.*, *Cheatham v. Harris*, No. 3:10-cv-541, 2012 WL 2873682, at *2 (E.D. Tenn. July 12, 2012). And rather than subduing such people by force in every instance, we generally expect police to favor controlling their surroundings by nonviolent means. *See* Ex. 2, Rules of the Tennessee Peace Officer Standards and Training Commission, Ch. 1110-04.

It is from that expectation that police orders were born. Indeed, police "[c]ommands are not just common to policing; they are essential to it." *See* Rachel Harmon, *Law and Orders*, 123 Colum. L. Rev. 943, 968–69 (2023). And "[o]ne might go as far as to say that, . . . with few exceptions, they are *the* method" through which police officers "execute the state's will." *Id.* But contrary to the Media Companies' suggestion, *no* Tennessee statute expressly grants police explicitly cabined authority to issue "official order[s]." Prelim. Inj. Br., Dkt. 19-1 at 92 (quoting Tenn. Code Ann. § 39-17-305). Instead, police officers' power to issue orders derives, by "necess[ary]" implication from, "the duties and powers that create policing." Harmon, *supra*, at 968; *see* Tenn. Code Ann. §§ 38-3-102, -103. That is, "the police power to stop, arrest, and search necessarily includes" an appropriately cabined "authority to issue enforceable commands to exercise those powers." Harmon, *supra*, at 974. And Tennessee's codebooks merely specify the punishments applicable to the willful disregard of orders issued pursuant to *preexisting*, *implicit* police authority. *See* Tenn. Code Ann. §§ 55-8-104; 39-17-305(a)(2).

The new statute at the center of this case works exactly the same way. *See* Bystander Prot. Act, 2025 Tenn. Pub. Act ch. 409, § 5 (attached as Ex. 1). Although it is true that Tennessee law already prevents obstruction of justice, *see* Tenn. Code Ann. § 39-16-602, up until now, the code-books and caselaw lacked bright-line rules, *see id*. So the General Assembly drafted a statute that allows the public to observe police work from a safe distance but protects police officers from having bystanders up "on top of [them]." Legislative Session Transcript, 33 (attached as Ex. 3). This new "Bystander Protection Act" only applies to certain situations: traffic stops, criminal in-vestigations, and ongoing threats to public safety. *See* Bystander Prot. Act § 5(a). But in those circumstances, members of the public now know that they may not intentionally approach within twenty-five feet of an officer after being clearly ordered "to stop approaching or to retreat." *Id.*; *see id.* § 5(b).

Perceiving themselves threatened by this popular legislation, the Media Companies brought a lawsuit to nip it in the bud. *See* Compl., Dkt. 1 at 1. They claim it is void for vagueness because it grants police authority to issue stay-back orders arbitrarily. *Id.* at 15-16. And in a related vein, they claim it violates the First Amendment by "criminaliz[ing] peaceful, nonobstruc-tive newsgathering." *Id.* at 17. For these reasons, the Media Companies have moved for a pre-liminary injunction. Motion, Dkt. 19. The Court should deny that request.

## ARGUMENT

The Media Companies have not carried their burden to justify the "tightly guarded remedy" of preliminary relief. *Lee II*, 137 F.4th at 575 (citing *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 198–200 (3d Cir. 2024)). "Those seeking a preliminary injunction must meet several requirements." *Sisters for Life, Inc. v. Louisville-Jeffer-son Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). *First*, "[t]hey must show a likelihood of success on the merits." *Id. Second*, "[t]hey must show irreparable harm in the absence of the injunction." *Id.*

*Third*, "[t]hey must show that the balance of equities" with respect to the other party "favors them." *Id.* And finally, "[t]hey must show that the public interest favors an injunction." *Id.* The Media Companies' motion fails at every turn.

## I. The Media Companies will likely lose this lawsuit.

Likelihood of ultimate success is "the most important part of th[e preliminary injunction] analysis." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). And the Media Companies cannot "establish that [they are] likely to succeed" for two independent reasons. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *First*, not one of these Companies has a justiciable right to injunctive relief against any of the State Officers. *Second*, their merits theories all suffer from critical flaws.

### A. The Media Companies lack justiciable causes of action.

The Media Companies' threshold problems stem from the manifold prerequisites to adjudicating constitutional issues in a pre-enforcement posture. To establish a cause of action under the Civil Rights Act, each Company must identify the "actual" enforcement authority each State Officer "possesse[s]" and show how he will use it to deprive that Company of some personal constitutional right. *Mackey v. Rising*, 106 F.4th 552, 559 (6th Cir. 2024) (quoting *Lindke v. Freed*, 601 U.S. 187, 191 (2024)); *see Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 870 (6th Cir. 2024); *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023). To evade Tennessee's sovereign immunity, each Company must request personalized protection from each State Officer's "specified un[constitutional] actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021); *L.W. ex rel. Williams v. Skrmetti* (*L.W. II*), 83 F.4th 460, 490 (6th Cir. 2023). And to establish a justiciable case or controversy, each Company must provide the "concrete context" ordinarily "afforded by an enforcement action." *Ammex, Inc. v. Cox*, 351 F.3d 697, 706–07 (6th Cir. 2003); *see Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024);

*Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024).  These requirements pose

several problems for the Companies.  Those problems incurably doom their motion.

    *First*, the Companies face no threat to their own constitutional rights.  "[B]y virtue of the

explicit language" Congress used in the Civil Rights Act, that statute grants "a personal [right of]

action cognizable only by the party whose civil rights [are being] violated." *Jaco v. Bloechle*, 739

F.2d 239, 242 (6th Cir. 1984).  Put differently, the right to relief this statute affords is "entirely

personal to the direct victim of the alleged constitutional tort," such that "[o]nly the purported

victim" of state action "may prosecute" a Civil Rights Act claim. *Chambers v. Sanders*, 63 F.4th

1092, 1100 (6th Cir. 2023) (quoting *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000)).

And this limit has been compounded by the *Ex parte Young* doctrine, which recognizes that state

officers enjoy immunity from suit in all but the narrowest circumstances. *See Ernst v. Rising*, 427

F.3d 351, 358–59 (6th Cir. 2005).  Specifically, a party using *Young* to bring a pre-enforcement

claim under the Civil Rights Act may seek only personalized protection from a state officer's

"specified un[constitutional] actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021).

    Yet in this case, the Media Companies want to litigate the hypothetical threat of the By-

stander Protection Act being enforced not against *them* but against their *employees*.  To be sure,

the Companies assert that the Bystander Protection Act will be "enforced against them."  Prelim.

Inj. Br., Dkt. 19-1 at 88.  But they provide no basis for that assertion, and the Court should wonder

how it could possibly be true.  As corporate entities, the Media Companies cannot "approach" a

police officer after being ordered not to do so.  Bystander Prot. Act § 5(a).  And it follows that

none of them could be arrested or prosecuted for violating the Bystander Protection Act. *See State

v. Danny Schultz Chevrolet, Inc.,* No. 03C01-9104-CR-116, 1992 WL 134452 (Tenn. Crim. App.

June 17, 1992).  Any "party-specific . . . relief" that might issue could therefore do them no good.

*L.W. ex rel. Williams v. Skrmetti* (*L.W. I* )*,* 73 F.4th 408, 415 (6th Cir. 2023).  The State Officers will not enforce the law against the Companies, so the Companies lack basis for suit.

*Second*, even if the Media Companies could litigate "the . . . civil rights" of their employees, they have still only sought to litigate how those rights *might* be threatened under speculative conditions.  *Jaco*, 739 F.2d at 242.  "The oldest and most consistent thread in the federal law of justiciability is that the federal courts will not grant advisory opinions."  *Boyle v. Anderson*, 68 F.3d 1093, 1100 (8th Cir. 1995) (quoting *Flast v. Cohen*, 392 U.S. 83, 96–97 (1968)).  And the doctrines of standing and ripeness exist to ensure, in combination, that a pre-enforcement lawsuit presents the same "concrete [factual] context . . . afforded by an enforcement action."  *Ammex*, 351 F.3d at 706–07; *see Friends*, 108 F.4th at 435 (citing *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017)).  Yet the Media Companies offer nothing of the sort.

Instead, they attempt to establish abstract propositions of constitutional law based on a host of "concern[s]" about what might happen in the future.  Rose Dec., Dkt. 19-6, at 125.  In fact, their employees cannot even definitively anticipate whether or "how [the Bystander Protection Act] will affect the way [they do their] job[s]," Cordan Dec., Dkt. 19-2, at 105, or whether they anticipate actually breaking the law if "ordered" by police "to step back."  Elliot Dec., Dkt. 19-4, at 116.  And although one employee asserts that he "would probably not comply and would risk being arrested," Taylor Dec., Dkt. 19-7, 132, others say they would at least "try to follow" such orders — which is all the law actually requires.  Dare Dec., Dkt. 19-3 at 109; *see* Partipilo Dec., Dkt. 19-5 at 121; Bystander Prot. Act, § 5.

Moreover, the employees trace few if any of their concerns to the actual terms of this new law, opting to focus instead on issues and circumstances that predate Tennessee's new bright-line rule for police work obstruction.  The employees say that their jobs require them to "get as close

to the scene as [they] can," Cordan Dec., Dkt. 19-2, at 104, and in the past that they were often asked to step back, *id.* at 107; Partipilo Dec., Dkt. 19-5, at 119. Based on their employee's past actions, the Companies claim that Bystander Protection Act raises the stakes because their employees "can be arrested if [they] do not back up far enough." Prelim. Inj. Br., Dkt. 19-1 at 84; Taylor Dec., Dkt. 19-7, at 132. That is wrong. The Bystander Protection Act does not require anyone to "back up." Bystander Prot. Act, § 5(a). A law forbidding an intentional approach does not subject someone to arrest for not backing up or even standing still. *See Nicodemus v. City of S. Bend, Indiana*, 137 F.4th 654, 662 (7th Cir. 2025). The employees' concerns do not align with the actions criminalized by the text of the Act. *See id.*

**B.** **The Media Companies lack standing.**

The Companies seem to think that standing is their only barrier to litigating this case. Prelim. Inj. Br., Dkt. 19-1, at 86-89. But, they even fail to establish standing. The Companies may only assert the rights of others in certain circumstances when "they have suffered their own Article III injury." *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 782 (6th Cir. 2023). Because the Bystander Protection Act cannot be implicated by the Companies, they have no injury. *See supra*, at 5-6.

Additionally, the Companies must show a close relationship with the person that possesses the violated right and some "hindrance" that limits the person's ability to assert it. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). The Companies do not even address these requirements. Prelim. Inj. Br., Dkt. 19-1 at 86-89. To assert the rights of others, "the relationship between the party asserting the right and the third party has been characterized by a strong identity of interests which is absent in an employer/employee relationship." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993). And the Companies express no reason why their

7

employees are hindered from filing suit, but their employees can provide declarations for the Companies' suit. The Companies failed to establish standing.

### C. The Media Companies' constitutional theories are meritless.

Threshold issues aside, the Media Companies allege no viable threat to anyone's constitutional rights. The Bystander Protection Act does not grant police officers unbridled discretion. Nor does it violate — or even directly impact — any First Amendment rights.

### 1. The Bystander Protection Act does not deny anyone due process.

The Media Companies base their Due Process claim on two closely related theories of vagueness: they say the Bystander Protection Act fails to provide fair notice of what is prohibited and grants Tennessee police unbridled discretion to issue dispersal "order[s]." Bystander Prot. Act § 5(a); *see* Prelim. Inj. Br., Dkt. 19-1 at 89-93. But in evaluating these arguments, the Court "must . . . consider any limiting construction . . . proffered" to bring the law within constitutional grounds and presume Tennessee's judges would construe the law to avoid any due process issues. *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)); *see Colum. Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) (quoting *Chapman v. United States*, 500 U.S. 453, 464 (1991)); *Willeford v. Klepper*, 597 S.W.3d 454, 465 (Tenn. 2020)). That would not be difficult here.

To begin, the Media Companies err by reading the Bystander Protection Act to grant new and unbridled police-order authority. *See* Prelim. Inj. Br., Dkt. 19-1 at 93. Nothing in the statute's text purports to grant police any new authority at all. Like similar statutes, the text *assumes* that police officers "can . . . already" issue orders in certain circumstances, incident to their other core powers and duties. Legislative Session Transcript, 7; *compare* Bystander Prot. Act § 5(a) (assuming pre-existing police-order authority), *with* Tenn. Code Ann. § 55-8-104 (assuming traffic-order authority); Tenn. Code Ann. § 39-17-305(a)(2) (assuming dispersal-order authority). And in fact,

8

the Media Companies point to those similarly worded statutes as examples of legislation that comports with the requirements of due process. Prelim. Inj. Br., Dkt. 19-1 at 92.

The Media Companies are right. *All* these statutes comport with the Due Process Clause because *none* of them grant police unbridled authority to issue arbitrary orders. *See, e.g.*, *id.* at 92 (discussing Tenn. Code Ann. § 39-17-305 and Tenn. Code Ann. § 55-8-104). Instead, the statutes simply provide various punishments for the "intentional[]" or "willful[]" disregard of police orders. Bystander Prot. Act, § 5(a); Tenn. Code Ann. § 55-8-104(a). But a police officer's authority to issue the order must come from elsewhere, such as the power to "regulate traffic" or keep the public peace. Tenn. Code Ann. § 55-8-104(a); *see id.* § 39-17-305(a)(2); *see, e.g.*, *People v. Jennings*, 347 N.Y.S.2d 818, 820 (J. Ct. 1973). Because this implied order-issuing power derives from and serves other legitimate police authority, the limits of such other authority apply to a police officer's derivative order-issuing power. *See, e.g.*, *King v. Shoate*, No. 20-cv-1145, 2023 WL 4188051, at *4 (W.D. Tenn. June 26, 2023). This means such police orders *cannot* be issued arbitrarily in violation of the Due Process Clause.

It also negates the Media Companies' nominally separate theory that the Bystander Protection Act denies them fair notice of what conduct is prohibited or required. *See* Prelim. Inj. Br., Dkt. 19-1 at 16–17. To be clear, the Media Companies do not feign ignorance about what it means to "intentionally approach[] within twenty-five feet [of] a law enforcement officer after" being "ordered . . . to stop approaching or . . . retreat." Bystander Prot. Act, § 5(a). Instead, they claim "due process requires that a law provide 'warning about the behavior that [can] prompt[] a lawful dispersal order.'" Prelim. Inj. Br., D.19-1 at 92 (quoting *Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012)). But that is the same as saying the police officer's order-issuing power must be appropriately cabined. So to the extent this even constitutes a separate theory, that theory fails.

Indeed, far from (silently) granting police new unconstitutional discretion to govern public spaces through arbitrary orders, statutes like the Bystander Protection Act only clarify and cabin the circumstances in which disregard of a police order constitutes a crime. In this case, the statute applies only when a police officer is "engaged" in a lawful traffic stop, an active criminal investigation, or an ongoing and immediate threat to public safety. Bystander Prot. Act, § 5(a)(1)-(3). And it does not impose criminal liability unless the police order at issue was "received," "understood," and intentionally violated "under . . . conditions and circumstances" that allowed for compliance. *Id.* § 5(b); *see id.* at § 5(a). The upshot is that the Media Companies have brought this suit to go tilting at windmills. Their vagueness argument does not square with Tennessee law.

### 2. The Bystander Protection Act does not violate the First Amendment.

The Bystander Protection Act does not violate the First Amendment either, the Media Companies' arguments to the contrary notwithstanding. *See* Prelim. Inj. Br., Dkt. 19-1 at 93-101, For three principle reasons, the Media Companies' free speech claims lack merit.

*First*, the Bystander Protection Act does not require heightened First Amendment scrutiny because it does "target[] 'speech as speech'" by attempting to regulate the expression of messages. *McLemore v. Gumucio* (*McLemore II* ), --- F.4th ----, 2025 WL 2319119, at *3 (6th Cir. 2025); *see Lichtenstein v. Hargett*, 83 F.4th 575, 584 (6th Cir. 2023). Indeed, a Court should always use "history and tradition" as a guide when a party invokes First Amendment rights. *Vidal v. Elster*, 602 U.S. 286, 301 (2024). And the Bystander Protection Act fits within a category of statutes and traditions that "bar[] *conduct* based on the harm the conduct causes" — specifically, the hindrance of safe and effective policing. *Lichtenstein*, 83 F.4th at 583 (emphasis added).

This shines through in the statute's text, something the Media Companies' First Amendment arguments all but ignores. Again, the text concerns itself with the space officers may give themselves to carry out "a lawful traffic stop," conduct "[a]n active [criminal] investigation," or

manage "an ongoing and immediate threat to public safety." Bystander Prot. Act, § 5(a). These terms do not "criminaliz[e] peaceful, nonobstructive newsgathering"; they do not address newsgathering at all. Prelim. Inj. Br., Dkt. 19-1, at 30. Nor can they be read to authorize stay-back orders issued for "no reason" other than to prevent reporters from recording or talking to police. *Id.* This case thus does not implicate the First Amendment concerns raised when police issue orders specifically to "stop criticism or filming" of their conduct and interactions with the public. *Jordan v. Jenkins*, 73 F.4th 1162, 1169-70 (10th Cir. 2023); *see also Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011), *cited by* Prelim. Inj. Br., Dkt. 19-1 at 86, 95.

*Second*, and in any event, there is no First Amendment right to record "within [twenty-five] feet of a law enforcement officer." Prelim. Inj. Br., Dkt. 19-1 at 95. The Court should question where such a right would even come from, as it does not naturally flow from the Free Speech Clause's "language." *Hils v. Davis*, 52 F.4th 997, 1001 (6th Cir. 2022). Indeed, the constitutional text refers to speech, not recording, and "[a] prohibition on recording speech is not a prohibition on speaking*." Id*. Nor does "the First Amendment . . . guarantee 'the press'" a special "constitutional right [to] access . . . information [un]available to the public.'" *Id.* at 1002 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)). And "our traditions" support prohibiting recording in "plenty of areas," particularly those where sensitive government work is underway. *Id.*

The Media Companies nonetheless assert a "right to record" police officers based on non-binding cases from other circuits. *See* Prelim. Inj. Br., Dkt. 19-1, at 17-22. But those cases typically involve police officers directly "*targeting*" speech through orders that stop recording as an "input[]" to future expression. *Lichtenstein*, 83 F.4th at 585. In other words, the police in those cases were attempting to "restrict[] the 'inputs' that speakers use to express a [disfavored] message." *Id.*; *see Glik*, 655 F.3d at 80; *Turner v. Driver*, 848 F.3d 678, 684 (5th Cir. 2017).

That is not how the Bystander Protection Act works.  The Act does not give police the authority to prohibit reporters from recording; in fact, the Act does not even give police any new authority to issue orders as all.  *See supra*, at 8.  Nor can the Media Companies use this case to litigate police conduct that the Bystander Protection Act does not authorize.  *See supra*, at 9.  And any circumstance where a reporter might be arrested to keep him from newsgathering is purely hypothetical and beyond the scope of this lawsuit.  *See supra*, at 6-7.

*Third*, even assuming the Media Companies could litigate whether the Bystander Protection Act violates the First Amendment in some abstract sense, they still could not show the strong likelihood of success needed to support a preliminary injunction.  Viewed in its most generous light, the Media Companies' First Amendment argument leads only to analysis under intermediate scrutiny.  *See* Prelim. Inj. Br., Dkt. 19-1 at 95.  And the Bystander Protection Act pursues compelling public interests through narrowly drawn means.

To begin, federal courts have long recognized that "the maintenance of public safety, security, and order" is a "significant governmental interest."  *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999).  And that is exactly the interest the Bystander Protection Act serves.  The Act only applies to specific situations: traffic stops, active criminal investigations, and ongoing threats to public safety.  *See* Bystander Prot. Act § 5(a).  All three circumstances involve potential threats to police officers *and* the public. *See, e.g., id.* § 5(a)(3).  The Act protects the safety of both.  For example, the Act applies during "a lawful traffic stop." *Id.* § 5(a)(1).  That protects both the police officers and any approaching individuals from unpredictable events that may occur during the stop. *Id.* § 5(a)(1).  And certainly, police officers' authority to issue stay-back orders during "an ongoing and immediate threat to public safety" protects the public's safety by definition.  *Id.* § 5(a)(3).  Thus, the Act's impetus is to protect public safety and order—a significant governmental interest.

*Grider*, 180 F.3d at 749.

As for the means employed by the Bystander Protection Act to pursue the above-mentioned interests, they are no more speech restrictive than the circumstances demand. Indeed, this statute came about precisely because Tennessee law lacked a needed brightline-rule to govern police interactions with the public in certain dangerous circumstances. Legislative Session Transcript, at 10-11. The General Assembly, thus, drafted a statute that allows the public to observe police work from a safe distance but protects police officers from having bystanders up "on top of [them]" under narrow circumstances that threaten the safety of bystanders and the police officers. Legislative Session Transcript, 33; *see* Bystander Prot. Act § 5(a). Simply put, members of the public would know that they may not intentionally approach within twenty-five feet of an officer since they must be clearly ordered "to stop approaching or to retreat." Bystander Prot. Act § 5(b). And even then, the public—and the Media Companies—can still observe the ongoings of police work, just at a distance that protects their safety. The Act's means do not unnecessarily restrict the Media Companies' claimed First Amendment rights. Rather, it protects their safety during events where it may be threatened and is appropriately tailored to that end.

## II.    The Media Companies have failed to show the equities tip in their favor.

Putting aside the Media Companies' failure to show a likelihood of success on the merits, they have also failed to establish that the equities warrant preliminary relief. To weigh those equities requires a determination of whether the Companies face irreparable harm under the status quo, as well as an appreciation for the potential harm to the State Officers and their constituents that would follow a court-ordered bar on the Bystander Protection Act's enforcement. *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024). The Media Companies have not established that any of these equities favor relief.

Start with the obvious problem that the Media Companies cannot themselves violate the Bystander Protection Act, so a "party-specific" injunction will do neither them nor their employees any good. *L.W. I*, 73 F.4th at 415; *see supra*, at 4-7. And because the Companies' employees "are nonparties who would not be bound by the judgment," an injunction purporting to run in their favor would offer them no effective relief. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023).

Moreover, even the harm purportedly faced by those employees is "speculative" and "theoretical" at best. *TowerCo 2013, LLC v. Berlin Twp. Bd. of Trs.*, 110 F.4th 870, 888 (6th Cir. 2024) (quoting *Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987)). That is, the Companies' reporters claim they will be affected by the law under a host of ill-defined future circumstances. One says he is "not sure how [the Bystander Protection Act] will affect the way [he does his] job." Cordan Dec., Dkt. 19-2, at 105. Another expresses "concern" that the Act "will be used as one more way to close avenues for information and make it more difficult for my crews to do their jobs." Rose Dec., Dkt. 19-6, at 125. Another is "not sure what I would do if an officer ordered me to step back." Elliot Dec., Dkt. 19-4, at 116. Others "would try" to follow police order or "don't know" if they could comply with the Act. Dare Dec., Dkt. 19-3, at 109; Partipilo Dec., Dkt. 19-5, at 121. While it might be obvious that reporters interact with police, the Court cannot anticipate the details of such an interaction in advance. *Cf. Ammex*, 351 F.3d at 706–07 (noting that adjudication of an enforcement action requires concrete factual context). For example, the reporters provide no basis to assume that police having power to issue orders will necessarily exercise that power. *See* Cordan Dec., Dkt. 19-2, at 105. One said, "I can count on one hand how many times an interaction with the police has escalated. I have never been arrested while doing my job." *Id.* And given the Act's limited scope, they provide no basis for expecting it will impact them at all. *See id.* .

As for the potential harm to the State Officers and the public interest, there is no gainsaying what is at stake. Our Constitution puts "the power to make the laws" in the hands of "those chosen by the people." *King v. Burwell*, 576 U.S. 473, 498 (2015). And while Congress rightly regulates certain limited subjects, the American people largely protect their own safety, and that of public officials, through policy judgment made by state legislators. *See Lee II*, 137 F.4th at 576. A federal court order impeding that "sovereign interest" would thus irreparably harm the State Officers and all Tennesseans. *Tennessee v. U.S. Dep't of Ed.*, 104 F.4th 577, 591 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022)). This is precisely why "[C]ourts ought to 'guard[]'" injunctive relief "with 'extreme caution'" and employ it against state officers only in very clear cases. *Lee II*, 137 F.4th at 575 (quoting Joseph Story, 2 Commentaries on Equity Jurisprudence § 959(b), at 303 (6th ed. 1853)).

In this case, aside from the palpable damage to popular sovereignty and federalism, an injunction would bar "[l]awful and important conduct" while allowing "unlawful and harmful conduct . . . to continue." *Abbott v. Perez,* 585 U.S. 579, 595 (2018). Police officers put their lives on the line to protect the public from danger. *See supra*, at 1-2. And the Tennessee General Assembly determined that it is safer for officers and bystanders if police officers have some space to do their work. Legislative Session Transcript, 11. This Court should not endanger the public, or our police officers, by preliminarily granting relief. If the Media Companies' constitutional theories have any merit, they will provide appropriate defenses to the law's abuse.

## III. Any grant of relief must be narrow, context specific, and party oriented.

If the Court decides to grant relief despite the issues above, it should limit such relief to comport with the "nature of the federal judicial power." *L.W. I*, 73 F.4th at 415.

"Federal courts are . . . not oracular authorities." *Doe v. Duling*, 782 F.2d 1202, 1205 (4th Cir. 1986). And among other things, this means they can only adjudicate the rights of the litigants

before them relative to each other, not the world at large. *See Hewitt v. Helms*, 482 U.S. 755, 761 (1987); *see also, e.g.*, *Texas v. ICC*, 258 U.S. 158, 162 (1922) (as a matter of standing); *Doe v. Lee* (*Lee I*), 102 F.4th 330, 341–42 (6th Cir. 2024) (same); *Jackson*, 595 U.S. at 44 (as a matter of sovereign immunity); *Crugher v. Prelesnik*, 761 F.3d 610, 615 (6th Cir. 2014) (same); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550 (2025) (as a matter of statutory authority to grant equitable remedies); *Chambers*, 63 F.4th at 1100 (as a matter of substantive Civil Rights Act liability); *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (same). Moreover, in cases concerning the constitutionality of state action, remedial orders should be "no broader than necessary to remedy" any "violation" of a particular plaintiff's constitutional rights. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998).

The relief granted must also be "injury-focused," meaning the Court's order must fit the Media Companies' justiciable grievance. *L.W. I*, 73 F.4th at 415. Thus, if a perceived defect in the Bystander Protection Act arises from some anticipated manner of enforcement, the Court should identify and address that "concrete context" in its injunction. *Ammex*, 351 F.3d at 706–07. That is, the order should "restrain[]" the State Officers *only* in "specific[]" and "detail[ed]" terms that tell them when, how, and under what circumstances they cannot enforce the Bystander Protection Act. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (quoting Fed. R. Civ. P. 65(d)(l)) (citing *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016)).

Here, much of the Media Companies' case hinges on the idea that this statute will be used in specific, questionable ways. For example, they do not want it to keep them from interviewing the Governor, gathering news at Metro Nashville Council meeting, or reporting from at the Capitol Building. Dare Dec., Dkt. 19-3, at 109; Elliot Dec., Dkt. 19-4, at 112-13; Partipilo Dec., Dkt. 19-5, at 119. The Court should thus consider an injunction that addresses those specific contexts,

rather than the law's use in other circumstances not even arguably being litigated.  To do otherwise would break "[t]he oldest and most consistent thread in the federal law of justiciability[:]federal courts will not grant advisory opinions."  *Boyle*, 68 F.3d at 1100 (quoting *Flast*, 392 U.S. at 96-97).

**CONCLUSION**

This Court should deny the Media Companies' motion for preliminary relief.


Respectfully submitted,


*/s/ Zachary L. Barker*
ZACHARY L. BARKER, BPR # 035933
Senior Assistant Attorney General

ANDREW D. DENNING, BPR #042208
Assistant Attorney General

Office of the Tennessee Attorney General
Constitutional Defense Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Zachary.Barker@ag.tn.gov
Andrew.Denning@ag.tn.gov

*Counsel for Commissioner Long and General Funk*

**CERTIFICATE OF SERVICE**

I certify that I filed the above document using the Court's CM/ECF system on September

12, 2025, which electronically served a copy to all counsel of record:

Grayson Clary
Reporters Committee for Freedom of the Press
1156 15th Street NW
Suite 1020
Washington, DC 20005
202-795-9300
Email: gclary@rcfp.org

Paul R. McAdoo
Reporters Committee for Freedom of the Press
6688 Nolensville Rd.
Suite 108-20
Brentwood, TN 37027
(615) 823-3633
Email: pmcadoo@rcfp.org

Allison L. Bussell
Metropolitan Legal Department
P O Box 196300
Nashville, TN 37219
(615) 862-6341
Email: allison.bussell@nashville.gov

_/s/ Zachary L. Barker_
Senior Assistant Attorney General